Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 10, 2004      Decided October 29, 2004

No. 01-7203

CYNTHIA JACOBS CARTER,
APPELLANT

v.

GEORGE WASHINGTON UNIVERSITY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cv03134)

———

*Karl W. Carter, Jr.* argued the cause and filed the briefs for appellant. *Nathaniel H. Speights* entered an appearance.

*Karen A. Khan* argued the cause and filed the brief for appellee.

Before: SENTELLE, TATEL, and ROBERTS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TATEL.

———

 Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

TATEL, *Circuit Judge*: George Washington University denied appellant, an African American born in 1951, promotions to all three positions she applied for over the course of a year. Resigning from GW, appellant sued, claiming race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, age discrimination under the Age Discrimination in Employment Act of 1967, retaliation, constructive discharge, and breach of contract. Appellant's trial counsel, however, conducted virtually no discovery, and GW moved for summary judgment, which the district court granted on all counts. Seeing insufficient evidence in the record from which a jury could find in appellant's favor, we affirm.

## I.

After beginning a job at appellee George Washington University, appellant Cynthia Carter received three promotions over five years while earning a master's degree and pursuing a Ph.D. From 1994 onward, Carter worked as Director of Reunions and Events in the Alumni Relations Office. According to Carter, because she spoke out about what she considered discriminatory treatment within that office, her relationship with Michael Worth, GW's Vice President for Development and Alumni Affairs, began deteriorating.

In 1997 and 1998, Carter applied for the positions of Executive Director of Alumni Relations, Director of Development at Mount Vernon College (a former women's college now owned by GW), and Director of Corporate and Foundation Relations. She obtained none of these promotions. Carter then resigned, taking a higher-paying job at Howard University.

Following the second promotion denial, Carter filed a complaint with the Equal Employment Opportunity Commission, which she later amended to cover the third denial. When the EEOC chose not to pursue the complaint, Carter sued GW in the United States District Court for the District of Columbia, raising claims based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e(16); 42 U.S.C. § 1981; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29

U.S.C. §§ 621-634; and common law. Specifically, she claimed race discrimination regarding all three promotion denials, age discrimination regarding the first two denials, retaliation regarding the last two denials, retaliation regarding an adverse evaluation, constructive discharge, and breach of contract.

Despite what the district court termed "ample opportunity to conduct discovery," Carter's trial counsel (she is now represented by different counsel) deposed no witnesses, served no interrogatories, and requested no admissions. *Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 107 (D.D.C. 2001); *Carter v. George Washington Univ.*, No. 99-3134 (D.D.C. May 17, 2001). At the very end of the discovery period, Carter's counsel did ask GW to produce certain documents, but because he failed to comply with the Federal Rules of Civil Procedure in submitting this request, "discovery . . . ended and plaintiff [had] taken no discovery whatsoever." *Carter*, No. 99-3134 (D.D.C. May 17, 2001). GW then moved for summary judgment. As part of her opposition, Carter attached her own affidavit, but submitted no sworn statements from any one else. Claiming that Carter's affidavit included "inadmissible hearsay, speculation and conclusions," GW moved to strike numerous paragraphs. Though the district court did not address GW's motion to strike, it granted GW's motion for summary judgment on all counts without referring to Carter's hearsay statements. *See* 180 F. Supp. 2d at 99-102, 111. The district court later denied Carter's motion for reconsideration. *Carter v. George Washington Univ.*, No. 99-3134 (D.D.C. Aug. 18, 2003).

## II.

Before addressing the merits of Carter's appeal, we consider GW's motion in this court to strike several of Carter's exhibits and those parts of her opening brief that reference them. Specifically, GW argues that certain pages from Carter's deposition and the university's personnel manual were never presented to the district court and thus cannot be part of the record on appeal. Conceding that her lawyer failed to

file these documents in opposition to GW's motion for summary judgment, Carter insists that counsel did file them as attachments to her motion for reconsideration. GW responds that even were this true, Carter may not have a "second bite at the apple" by including in her motion for reconsideration evidence which she could have submitted to the district court prior to summary judgment.

We need not consider GW's latter argument, for our review of the district court's docket sheet and file convinces us that Carter's trial counsel never filed the disputed documents as attachments to the motion for reconsideration, although the motion itself made reference to them. This circuit will not normally consider evidence that a party never presented to the district court. *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1035-36 (D.C. Cir. 1988); *see* Fed. R. App. P. 10(a) (describing the composition of the record on appeal). To be sure, in *Eureka Investment Corp. v. Chicago Title Insurance Co.*, 743 F.2d 932, 945 n.55 (D.C. Cir. 1984), we treated as part of the record an exhibit never formally moved into evidence in the district court, but we did so because all parties and the district court treated the exhibit as evidence. In this case, by contrast, GW objected to the documents from the first possible moment, and the district court never mentioned them in its denial of Carter's motion for reconsideration, *Carter*, No. 99-3134 (D.D.C. Aug. 18, 2003).

We therefore grant GW's motion to strike and will disregard the disputed exhibits in the remainder of this opinion.

## III.

This brings us, then, to Carter's challenges to the district court's entry of summary judgment for GW. As usual, we review a district court's grant of summary judgment de novo and will affirm only if, viewing the evidence in the light most favorable to Carter and drawing all reasonable inferences accordingly, we conclude that no reasonable jury could reach a verdict in Carter's favor. *See Holbrook v. Reno*, 196 F.3d 255, 259-60 (D.C. Cir. 1999); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Because Carter never claimed in the district court, as she does here, that the record contains direct evidence of discrimination, she has waived this argument. *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 535 (D.C. Cir. 2003) (finding direct-evidence argument waived when not raised below). We will therefore evaluate her claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, in order to establish a prima facie case for a discrimination claim, the plaintiff must show that (1) she "belongs to a" protected class; (2) she "applied and was qualified for a job for which the employer was seeking applicants"; (3) "despite [her] qualifications, [she] was rejected"; and (4) "after [her] rejection, the position remained open and the employer continued to seek applicants from persons of [her] qualifications." *McDonnell Douglas*, 411 U.S. at 802. For a retaliation claim, the plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). "Where, as here, the plaintiff claims that the retaliation took the form of a failure to hire, the plaintiff must also show: 4) that [she] applied for an available job; and 5) that [she] was qualified for that position." *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003).

If the plaintiff satisfies her prima facie case, then the employer must "produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004). Once the employer has met this burden of production, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional discrimination or retaliation from all the evidence, including "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or atti-

tudes on the part of the employer).” *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)) (internal quotation marks omitted); *see also Kidd v. District of Columbia*, 206 F.3d 35, 46 (D.C. Cir. 2000).

Because the *McDonnell Douglas* framework governs all of Carter’s Title VII, ADEA, and 42 U.S.C. § 1981 claims, *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (applying framework to ADEA claims); *Berger v. Iron Workers Reinforced Rodman Local*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1998) (applying framework to § 1981 claims), we shall apply it to each of her three promotion denials in turn.

### *Executive Director of Alumni Relations*

When GW’s Executive Director of Alumni Relations resigned in 1997, Carter applied for the position along with many other candidates. Michael Worth, Vice President for Development and Alumni Affairs, appointed a ten-person search committee to review applications, interview candidates, and then recommend at least three finalists to him for the final decision. Joe Hall, Associate Vice President for University Development, served as the nonvoting committee chair; the committee also had four alumni and five administrators, including two African Americans. The committee narrowed the field and interviewed only five candidates: Carter, two white men under age forty, and two white women. It recommended only the four white candidates to Worth, who ultimately picked one of the men, Keith Betts. Betts had recently received a Ph.D. in Higher Education Administration and, like Carter, had worked as a director in the Alumni Relations Office since 1994. He had started working there a few months after Carter and occupied a lower salary grade.

According to Joe Hall, the committee decided against recommending Carter for several reasons, including poor interviewing skills and lack of qualifications. Most committee members ranked her last. During her deposition Carter testified that a few weeks after the interview, she sought out an African-American committee member for advice, and that

member suggested that she adopt a new approach to interviews.

Carter filed her complaint with the EEOC more than 180 days after GW's decision to select Betts and more than 240 days after learning that the committee had declined to send her name forward to Worth. Asserting that Title VII requires the filing of complaints within 180 days of the time the employee learns of the challenged employment action, GW argues that Carter's claims are untimely. But 29 C.F.R. § 1601.13(a)(4)(ii)(A) provides that employees have up to 300 days to file where a worksharing agreement exists between the EEOC and a local fair employment practices agency. Since the EEOC had such an agreement with the D.C. Office of Human Rights at the time of Carter's complaint, *see* Pl.'s Ex. 14, J.A., vol. 1, tab 14, Carter had up to 300 days to file with the Commission. By any count, she met this deadline, thus preserving her right to sue.

As GW concedes, Carter has established a prima facie case under *McDonnell Douglas* for both race and age discrimination. An African American over forty, Carter belongs to two protected classes; she possessed the qualifications identified as necessary for the position in GW's job description; and the committee rejected her while advancing four other applicants. To survive summary judgment, however, she must also present evidence to rebut GW's proffered legitimate nondiscriminatory reason that she interviewed poorly.

We review subjective considerations like GW's given reason with "caution," since employers can easily use such criteria to "mask discrimination." *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc). In *Aka*, for example, the employer offered the plaintiff's lack of enthusiasm as a basis for the decision not to hire, but the plaintiff claimed that he "expressed enthusiasm at his interview" and introduced corroborating evidence suggesting high motivation. *Id.* at 1297-98. Specifically, Aka presented evidence that he had volunteered at the Washington Hospital Center in hopes of getting hired, that he had applied for numerous other jobs at the hospital, and that in a related hiring dispute

an arbitrator had described him as "highly intelligent and motivated." *Id.* at 1298. Based on this evidence, we found that a reasonable jury could disbelieve the employer's proffered reason for refusing to hire Aka. *Id.* at 1298-99.

Carter's situation differs quite significantly from Aka's. She neither claimed that her interview went well nor offered a sufficiently concrete description of her interview from which we might infer that it did. Indeed, to rebut GW's proffered reason, she offers only one admissible piece of evidence: the affidavit of Dr. Graeme Baxter, Executive Dean of GW's Mount Vernon campus, which described Carter as seeming "very professional" in an interview conducted several months later for a different job. In combination with other evidence, this fact might well prove useful for rebutting GW's reason, as did Aka's evidence that an arbitrator thought highly of him. Standing alone, however, the affidavit falls far short, for we cannot see how a reasonable jury could use a single positive description of Carter's behavior during a job interview to infer that she interviewed well during a different interview conducted by different decision-makers months earlier.

In her affidavit, Carter states that while two of the other candidates told her that the committee asked them only five or six questions, the committee asked her around nineteen questions. We have no need to consider whether such evidence could counter GW's proffered nondiscriminatory reason, however, because Carter's trial counsel failed to depose any of the candidates or committee members, and we cannot consider inadmissible hearsay evidence presented by one party where, as here, the other party objected and moved to strike. *Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 7 (D.C. Cir. 1998); *see also* Fed. R. Civ. P. 56(e).

In short, Carter presents no admissible evidence from which a reasonable jury could infer that GW's claim that she interviewed poorly was pretextual. Given this, we have no need to address whether she can rebut GW's second nondis-

criminatory reason—that the committee found her less qualified than other candidates.

Finally, we note that Carter has offered very little other evidence that the committee might harbor discriminatory animus. While she makes factual allegations which, if true, might suggest discriminatory intent on the part of Michael Worth, he was not a decision-maker at the committee level, nor does Carter suggest that he exercised discriminatory animus in selecting the committee members. Indeed, responding to GW's specific interrogatories, Carter named none of the committee's voting members as discriminatory actors; she named only Keith Betts, Joe Hall, and Michael Worth. Because no reasonable jury could find sufficient evidence to infer intentional discrimination from the evidence before us, the district court correctly granted summary judgment to GW on Carter's race and age discrimination claims related to this promotion denial.

*Director of Development*

In the spring of 1998, Carter applied for the position of Director of Development at GW's recently absorbed Mount Vernon campus. GW sought to hire a director who would work with Baxter to identify, cultivate, and solicit major gifts. The job description called for a bachelor's degree, with a "master's degree . . . preferred," and a minimum six years of fundraising experience. Baxter and Hall interviewed Carter and two other applicants, including Sarah Morgan. A thirty-three-year-old white woman, Morgan worked as GW's Associate Director of Development for Major Gifts and had at least nine years of experience in fundraising, including a year spent working at a women's college. When Baxter identified Morgan as the best candidate, Hall agreed to hire her. According to Baxter, she selected Morgan because of Morgan's experience managing fund-raising campaigns and working at a women's college. Carter was "not a viable candidate," Baxter concluded, because she "had no pertinent experience working with potential major donors, and had never directed a fund-raising campaign of any size, let alone a major fund-raising

campaign for a college or university." No evidence suggests that Baxter knew of Carter's prior complaints about discrimination.

Carter alleges that GW rejected her for this promotion due to her race and age, and in retaliation for her allegations that she had experienced discrimination in her earlier promotion denial. The district court found that Carter had not established a prima facie case for these claims because she failed to show that she and Morgan were "similarly qualified for the position." 180 F. Supp. 2d at 107. To make out a prima facie case in this circuit, however, a plaintiff need not show that she is as qualified as the successful applicant, only that she is qualified "relative to the *entire pool from which applications are welcome*." *Mitchell v. Baldrige*, 759 F.2d 80, 85 (D.C. Cir. 1985). We need not determine whether Carter would meet the prima facie requirements for qualifications under the *Mitchell* standard, however, for she has failed to present evidence from which a reasonable fact-finder could infer that GW's proffered reason for hiring Morgan over Carter was pretextual. *See Morgan*, 328 F.3d at 653-54 (not addressing whether plaintiff met prima facie requirements where plaintiff could not rebut legitimate nondiscriminatory reason). Nor, for the same reason, need we address whether Carter has made out a prima facie case for retaliation. If she has failed to provide evidence which could lead a jury to doubt GW's legitimate nondiscriminatory reason—that it hired Morgan because she was the better candidate—then Carter cannot survive summary judgment in any event.

Under *Aka*, "[i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate." 156 F.3d at 1294. Comparing Carter's background to Morgan's, however, a jury could not reasonably conclude that Carter was significantly better qualified for the position. Although Carter had a master's degree at the time—Morgan's highest degree was a bachelor's—Morgan had far more experience in fundraising. Carter's resume described her experience as "including 6

years of soliciting companies and organizations to provide funds for GW campus and Off-Campus Programs." Her resume supported this assertion with the following specific descriptions: she (1) ran the Distinguished Alumni Awards program "resulting in the cultivation of numerous recipients who became GW donors"; (2) "[p]articipated in monthly meetings related to the university Centuries Campaign"; (3) "[w]rote a proposal that won a grant from the National Geographic Society"; (4) "[s]olicited and obtained the sponsorship of corporate tables at GW events"; (5) "[s]olicited and generated funds from alumni by including a 'gift option' on mailings and announcements"; and (6) participated in a telephone fundraiser.

By contrast, Morgan's resume presented far more extensive and intensive fundraising experience. Among her current job responsibilities, she listed items like (1) "[m]anage pool of 200 major gift prospects to support endowment and current operating objectives of the Columbian School's $30 million portion of the University's $300 million *Centuries Campaign*"; (2) "[s]uccessfully identify, cultivate, solicit, and steward major gift prospects"; and (3) "[p]repare written proposals, endowment agreements, and other solicitation materials needed to secure major gifts." In prior jobs at GW and other schools, moreover, Morgan listed such accomplishments as (1) "[i]dentified, cultivated, solicited, and stewarded 200 prospects to secure multi-year commitments for the School's Dean's Fund, Department Chair's Fund, and Special Projects"; (2) "[d]eveloped five-year strategic plan for annual fund campaign during the University's *Centuries Campaign*"; (3) "[d]eveloped and implemented prospect tracking system for the University's 1,500 leadership giving prospects"; (4) "[i]mplemented volunteer-driven alumni corporate campaign among 2,000 alumni"; and (5) "[d]eveloped and implemented comprehensive student telemarketing program geared toward special gift campaign prospects and increasing long-term leadership giving."

Given Morgan's far more substantial experience in fundraising, we see no basis for a jury to find that a reasonable employer would have found Carter more qualified—let alone

significantly more qualified—for the position of Director of Development at Mount Vernon. Because Carter offers no other evidence to attack Baxter's reason as pretextual and indeed offers no other evidence from which a jury could infer discriminatory or retaliatory intent on the part of Baxter, we affirm the district court's grant of summary judgment on all counts related to this promotion denial.

*Director of Corporate and Foundation Relations*

Following the two denials of promotion described above, Carter applied for yet a third GW position—Director of Corporate and Foundation Relations. That position entailed responsibility for coordinating the university's grant management and soliciting funds from corporations and foundations. Such contributions made up a major part of GW's fundraising total: from 1995 to 1997, GW received between eleven and seventeen million dollars annually from corporations and foundations.

The university hired a consulting firm to do the initial screening. That firm prepared a list of required job qualifications, which included a bachelor's degree (master's preferred); "[c]omprehensive professional experience in university corporate and foundation relations"; and a "[d]emonstrated track record of successful fund raising activities and a demonstrated ability to solicit high-level gifts."

The consultant in charge of the search, Katherine White, interviewed Carter but did not recommend her for further consideration. According to Carter, White informed her that "irrespective of the qualifications that she thought I possessed, per the instructions of Mr. Joseph Hall, I was being denied the opportunity to interview and compete for the position." Sometime after this conversation, White wrote a letter to Hall which stated that she had met with Carter, found her unqualified due to lack of experience, and, after consulting with Hall, called her to say that GW would consider her no further. GW later withdrew the position for lack of qualified applicants and then, several months later, restruc-

tured the position, increased the salary, and convinced the employee who had last held the position to return.

Carter challenges this promotion denial as both racially discriminatory and retaliatory. The district court found that Carter failed to make out a prima facie case of discrimination because she had not shown "that the position was filled by a member outside of the protected class," 180 F. Supp. 2d at 108, a requirement which the court deemed necessary under *McDonnell Douglas*'s fourth element. Since then, however, we held in *Stella v. Mineta*, 284 F.3d 135, 144-45 (D.C. Cir. 2002), that under *McDonnell Douglas* a plaintiff need not show that the position was filled by someone outside her protected class in order to make a prima facie case, though the plaintiff must show that the position was not withdrawn simply for lack of a vacancy, *see Teneyck*, 365 F.3d at 1152-53. Here, the position not only remained unfilled, but, as shown by GW's later efforts to bring back the former employee, the university still needed someone to occupy the position. Under *Stella*, then, Carter's claim does not fail based on *McDonnell Douglas*'s fourth element.

As GW points out, Carter still fails to make out a prima facie case for both discrimination and retaliation because she has not shown that she was qualified for the position. The resume Carter submitted to GW nowhere indicates expertise in fundraising. That resume even fails to list the fundraising-related activities included in the resume Carter submitted for the Mount Vernon job. Even supposing that Carter told White about these additional activities during their meeting, they fall short of "a demonstrated ability to solicit high-level gifts." Nor does her resume reveal much experience with university corporate and foundation relations. The only relevant references appear in two lines of her two-and-a-half page resume: in its description of her earlier GW job as Director of Off Campus Programs, Carter's resume states that she "solicited participation from corporate, foundation, and military offices" and "maintained database and corresponded with various corporate, foundation, and governmental prospects." We think no reasonable jury could find that this quite modest

description measures up to "comprehensive" experience in university corporate and foundation relations.

Carter thus fails to meet the minimum objective criteria for the position of Director of Corporate and Foundation Relations. Given this, and given that Carter showed neither that these criteria were unnecessary for the job, *cf. Barbour v. Merrill*, 48 F.3d 1270, 1274, 1276 (D.C. Cir. 1995) (holding that plaintiff met his prima facie case despite lacking one objective qualification sought by the employer because a jury could determine that this criterion was unnecessary), nor that White recommended other candidates who lacked these objective criteria, *cf. Kinsey v. First Reg'l Sec., Inc.*, 557 F.2d 830, 836-37 (D.C. Cir. 1977) (holding that plaintiff met her prima facie case despite lacking certain objective criteria because "these criteria were not applied alike to all applicants"), she has failed to show that she meets the qualifications requirement of the *McDonnell Douglas* prima facie case. Accordingly, we affirm the district court's grant of summary judgment to GW on all counts related to this promotion denial.

## IV.

Carter also challenges the district court's grant of summary judgment to GW on three other counts: retaliation from a negative evaluation, constructive discharge, and breach of contract. These arguments are either waived or unsupported. Carter's opening brief never challenged the district court's ruling on her negative-evaluation claim, and we do not consider claims raised for the first time in a reply brief. *Fitts v. Fed. Nat. Mortg. Ass'n*, 236 F.3d 1, 3 n.2 (D.C. Cir. 2001) (per curiam). Carter's constructive discharge claim fails as it must be predicated on a showing of either intentional discrimination, *see Bishopp v. District of Columbia*, 788 F.2d 781, 789-90 (D.C. Cir. 1986), or retaliation, and we have upheld summary judgment on each of her claims that could have formed the basis for this showing. Finally, Carter's breach-of-contract claim depends on her argument that the GW personnel manual created a contract requiring the university to abide by federal antidiscrimination laws. But as

we noted above, Carter's trial counsel failed to present the relevant parts of this manual to the district court, and Carter nowhere mentioned the manual's antidiscrimination clauses during the portions of her deposition that are part of the record. Without these clauses, no reasonable fact-finder could infer the existence of such a contract. Moreover, as with Carter's constructive discharge claim, this claim cannot survive summary judgment because she cannot show illegal discrimination in the first place.

## V.

Because Carter has failed to offer any evidence from which a reasonable jury could find in her favor, we affirm the district court's grant of summary judgment to GW on all counts.

*So ordered.*