**Mohammad BALOCH, Plaintiff,**

v.

**Gale NORTON, Secretary of the Interior, Defendant.**

**No. CIV.A.03–1207(RMU).**

United States District Court, District of Columbia.

Jan. 13, 2005.

Robert C. Seldon, Molly E. Buie, Seldon Anderson, P.C., Washington, DC, for Plaintiff.

Rhonda C. Fields, United States Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION

URBINA, District Judge.

#### GRANTING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING THE · PLAINTIFF LEAVE TO AMEND

### I. INTRODUCTION

This matter comes before the court on the defendant's motion for summary judgment. The plaintiff, Mohammad S. Baloch, brings suit against the Department of the Interior pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.,* Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e–2000e(16), and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, for discrimination, hostile work environment, and retaliation. Because the plaintiff fails to establish an adverse personnel action or a hostile work environment, the court grants in part the defendant's motion for summary judgment. However, because the plaintiff may have intended to bring a claim for retaliation based on hostile work environment, in the interest of justice the court grants the plaintiff leave to amend his complaint for the limited purpose of raising such a claim.

## II. BACKGROUND

### A. Factual Background

#### 1. The Early Years (1991–2000)

The plaintiff is a "brown-skinned" Muslim from Pakistan and over seventy years old. Def.'s Statement of Undisputed Material Facts ("Def.'s Statement") ¶ 1; Pl.'s Statement of Undisputed Material Facts ("Pl.'s Statement") ¶ 1. He has several medical conditions that do not interfere with his job performance and are not disabling, including blindness in his left eye. Def.'s Statement at ¶ 2. The Bureau of Indian Affairs ("BIA") hired the plaintiff in 1991 as a "GS–14 Water Rights Specialist/Engineer" in its Natural Resources Division ("NRD"). *Id.* ¶ 3. Although the parties disagree on the precise scope of the plaintiff's responsibilities at the BIA, the plaintiff generally performed tasks such as preparing the Office of Trust Responsibilities' ("OTR") budgets for water resources programs and working on water rights issues. *Id.* ¶ 12.[1]

In 1996, Terrance Virden, Director of the OTR, designated the plaintiff Acting Branch Chief. *Id.* ¶ 9. Until 2000, the plaintiff worked directly under Virden. *See id.* ¶ 15. Jeffrey Loman became Chief of the NRD in Spring 2000, however, and thus the plaintiff's first-line supervisor. *Id.* With Loman's appointment, Virden became the plaintiff's second-line supervisor. *Id.* In June 2002, Virden became the plaintiff's third-line supervisor. *Id.*

The plaintiff received performance awards from the BIA in 1999, 2000, and 2001. Compl. ¶ 13.[2] Furthermore, in his performance reviews from 1991 to 1995, the plaintiff received "outstanding" or "highly satisfactory" evaluations. *Id.* ¶ 14. Beginning in 1995, when the BIA apparently switched to a "pass/fail" evaluation system, the plaintiff received "pass" ratings. *Id.*

#### 2. Problems at Work: the Plaintiff and Jeffrey Loman (2000–2004)

The plaintiff alleges that, beginning in December 2000, Loman "repeatedly subjected [the plaintiff] to verbal abuse without cause." Compl. ¶ 16. For example, when the plaintiff was at a meeting in New Mexico, Loman called the plaintiff and "exploded" about why funding for a historical study was not distributed, "shouted" that he did not approve of the plaintiff's extended stay in New Mexico, "ordered" the plaintiff to get his "fucking ass" back to Washington, and reminded the plaintiff who his "fucking" supervisor was. Def.'s Statement ¶ 15; Baloch Dep. at 45–48.

In March 2001, Loman and the plaintiff had a disagreement about why a report on the Zuni Salt Lake was not finalized. Def.'s Statement ¶ 17. As the plaintiff puts it, "Loman yelled and was abusive toward Mr. Baloch without cause on the date in question." Pl.'s Statement ¶ 17.

---

**1.** The plaintiff characterizes his duties as falling into two areas: water rights adjudication and water resources management planning. Pl.'s Statement ¶ I.C. The plaintiff further maintains that he was the only Water Rights Specialist who performed both of these functions from 1992 until 2001. *Id.* ¶¶ I.DE.

**2.** All references to the complaint are to the plaintiff's first amended complaint.

On March 13, 2001, Loman sent the plaintiff "fact finding" questions about the report. Def.'s Statement ¶ 18. The plaintiff characterizes this "fact finding" as "disciplinary" and states that Loman threatened even further disciplinary action. Pl.'s Statement ¶ 18. Three days later, Loman expressed dissatisfaction with the plaintiff's budget calculation process. Def.'s Statement ¶ 19. Loman again "screamed and shouted" at the plaintiff on March 26, 2001 regarding the Zuni Salt Lake report. Pl.'s Statement ¶¶ II.L, N–P. In May 2001, Loman and the plaintiff had a disagreement about whether the plaintiff would travel for an assignment or conduct the work by phone. Def.'s Statement ¶ 26. And in December 2001, Loman issued a letter of reprimand to the plaintiff. Pl.'s Statement ¶ II.D.

After the plaintiff filed an "informal" EEOC complaint in June 2001 and the plaintiff "refused the agency's demand to withdraw his complaint," Loman threatened a criminal investigation of the plaintiff, review of his personnel file, and scrutiny of all the plaintiff's travel vouchers. Compl. ¶¶ 20–21. After the plaintiff filed a formal EEOC complaint in August 2001, "Mr. Loman's harassment of and hostility towards [the] plaintiff increased sharply." Id. ¶ 23. Loman issued the plaintiff a "letter of counseling" on January 4, 2002, a second "letter of counseling" on March 3, 2003, and a "letter of reprimand" on April 8, 2003 concerning the plaintiff's "failure to perform assigned duties as directed, failure to follow a supervisor's directive and unprofessional and discourteous conduct." Def.'s Statement ¶¶ 29–32. Loman also subjected the plaintiff to "fact finding" disciplinary meetings "in which [the plaintiff] was interrogated, intimidated, and verbally abused," Compl. ¶ 24, and did not give the plaintiff a cash award for his performance in 2001, despite the plaintiff's extensive work on the Zuni Salt Lake Report, id. ¶ 25.

On February 5, 2003, Loman gave the plaintiff a notice of leave restriction. Def.'s Statement ¶ 30. A week later, Loman questioned the plaintiff "in a hostile and accusatory tone" about a doctor's appointment the plaintiff had on February 10, 2003 and asked the plaintiff "extremely personal and invasive questions, including whether [the plaintiff] was being treated for diseases such as AIDS." Baloch Decl. ¶ 90. On March 13, 2003, Loman yelled at the plaintiff regarding a request for advanced sick leave the plaintiff had submitted on March 3, 2003. Id. ¶ 91. On this occasion, Loman told the plaintiff that Loman could not understand why the plaintiff had received performance awards and questioned the plaintiff's writing abilities. Id.

In August 2003, Loman re-issued restrictions on the plaintiff's use of sick leave. Def.'s Statement ¶ 33. That month, Loman escorted the plaintiff to a vacant office, slammed the door shut, and shouted at the plaintiff that Loman was "fed up" with the plaintiff's "bullshit" complaints. Pl.'s Statement ¶ II.P. On September 25, 2003, Loman issued a memorandum of proposed suspension for two calendar days. Def.'s Statement ¶ 36. In October 2003, Loman refused to sign the plaintiff's travel requests to prepare for a conference and threatened to have the plaintiff "arrested, led out of the main Interior building in handcuffs, and jailed." Pl.'s Statement ¶ II.Q. The same month, Loman gave the plaintiff a performance report that rated the plaintiff's performance results as "not achieved." Def.'s Statement ¶ 38. Finally, in January 2004, Loman issued a proposal to suspend the plaintiff for thirty days. Pl.'s Statement ¶ II.A.

### 3. Daniel Picard Arrives (2001)

In May 2001, Loman hired Daniel Picard as a "GS–14 Water Rights Specialist." Def.'s Statement ¶ 21. Born in 1962, Pi-

card is a Native American with experience in water law, Indian water rights, gaming, and events and information services. *Id.* ¶¶ 21–23. The defendant characterizes Picard's responsibilities as water rights adjudications, distribution of funds pertaining to water rights adjudication, and management of water resources. *Id.* ¶ 24–25. As the plaintiff maintains, however, Picard "took over all or virtually all the water resources and water resources management duties." Pl.'s Statement ¶ 24. As a result, the plaintiff received no further assignments in water rights adjudication, and by December 2002, the plaintiff's "remaining substantive programmatic duties in water resources management planning were withdrawn and either transferred [ ] to Mr. Picard or performed by Jeffery Loman." *Id.* ¶¶ I.E–G. Thus, the plaintiff could only perform duties that, as the plaintiff puts it, were "not considered substantial enough to be reflected in [the plaintiff's] position description." *Id.* ¶ I.H.

## B. Procedural History

On June 21, 2001, the plaintiff requested EEOC counseling based on race/national origin, age, and disability discrimination. Compl. ¶ 20. The plaintiff filed a formal EEOC complaint on August 30, 2001. *Id.* ¶ 22; Def.'s Statement ¶ 28. On December 11, 2001, the Director of Interior's Office for Equal Opportunity wrote to advise the plaintiff that his additional allegations were encompassed by his original formal complaint, and that no additional action was required. Pl.'s Opp'n at 22. Between August and November 2003, the plaintiff filed four administrative complaints regarding leave restrictions, hostile work environment, verbal harassment, refusal to authorize business travel, the threat to have the plaintiff arrested, and an unsatisfactory performance appraisal. *Id.* at 23–24. The plaintiff brought the instant action on June 4, 2003. The plaintiff filed his first amended complaint on December 12, 2003.

## III. ANALYSIS

### A. Legal Standard for A Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or con-

clusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879–80 (D.C.Cir.1997), overturned on other grounds, 156 F.3d 1284 (D.C.Cir.1998) (en banc); *see also Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993).

## B. The Plaintiff's Claims Based on Discrete Acts

### 1. Overview

■ Before proceeding, the court takes a moment to provide an overview of the plaintiff's claims based on discrete acts and to outline how the court will address the parties' submissions. From the plaintiff's complaint, the court would have thought that the plaintiff planned on pursuing a variety of alleged adverse personnel actions (for example, verbal abuse, travel restrictions, criticism of the budget process, threatened disciplinary action, letters of counseling, failure to recommend for a cash award, and accusations of sick leave abuse). *See generally* Compl. The defendant appears to have thought the same, analyzing at least ten separate events in its motion for summary judgment and separately analyzing each one. *See generally* Def.'s Mot. Summ. J ("Def.'s Mot."). In the plaintiff's opposition, however, the plaintiff does not specifically respond to the defendant's arguments regarding the purported adverse personnel actions. Rather, the plaintiff explicitly focuses his arguments on, as the plaintiff describes it, the "one concrete employment action at issue," Opp'n at 2, "specifically, the withdrawal of [the plaintiff's] substantive duties," *id.* at 3.[3] The court therefore holds

3. The plaintiff summarizes his case in his opposition as follows:

[The plaintiff's] claims are essentially divided in two. The first concerns the withdrawal of his substantive duties and their reassignment to a newly hired colleague, Daniel Picard, who is approximately 30 years junior to Mr. Baloch and shares the same race as their immediate supervisor, Jeffery Loman. The second is the constellation of actions to which Mr. Loman has subjected Mr. Baloch ... which collectively comprise a hostile work environment.

Opp'n at 4; *see also id.* at 28 (stating that the plaintiff's "tangible claim is that the agency significantly diminished his material responsibilities and reassigned them to Mr. Picard, an actionable change in his employment by itself") (internal quotations and bracket omitted); *id.* at 29 (listing certain incidents and stated that they were *"not,* other than the withdrawal of Mr. Baloch's duties, actionable in individual complaints") (emphasis in original).

The plaintiff further states that his complaint "identifies a number of other personnel actions that [are] actionable either individually or as part of a hostile work environment. For purposes of summary judgment, plaintiff has limited himself to the personnel actions identified in this Opposition." Opp'n at 25 n. 6. Frankly, the court is a bit flummoxed by this comment. At this stage of the case, however, a footnote allusion to the complaint is no better than omitting a response altogether, for certainly the plaintiff does not expect the court to decide matters efficiently and effectively by responding to more than fifteen pages of the defendant's argument, Def.'s Mot at 21–38, with a two-sentence footnote. *See*

that the plaintiff concedes that all of the events that the defendant analyzes in its motion for summary judgment are not adverse personnel actions, except for the withdrawal of the plaintiff's substantive duties. *See, e.g., F.D.I.C. v. Bender,* 127 F.3d 58, 66–67 (D.C.Cir.1997); *Nails v. England,* 311 F.Supp.2d 116, 122 (D.D.C. 2004).

■ The next concession comes from the defendant. In its motion summary judgment, the defendant provides a table of adverse personnel actions (no doubt anticipating that the plaintiff was prepared to argue at least ten separate actions). Def.'s Mot at 14–17. The left column states the potential adverse personnel action and date of its occurrence; the two right columns—one for Title VII and the Rehabilitation Act, and the other for the ADEA—state either "bar," "yes," or "no." "Bar" indicates that the claim is barred; "yes" indicates that the plaintiff timely filed an EEOC charge; and "no" indicates that the plaintiff did not file a charge or seek counseling. Def.'s Mot. at 13 n. 2. The defendant botches this potentially useful method of organization by frequently leaving the right-hand cells blank—and, most importantly for this case, leaving blank the cells corresponding to withdrawal of the plaintiff's substantive duties. Def.'s Mot. at 14. Because exhaustion is an affirmative defense, *Bowden v. United States,* 106 F.3d 433, 437 (D.C.Cir.1997), the court interprets the blank cells in the defendant's table as an indication that the defendant is not raising the affirmative defense of exhaustion as to the corresponding purported adverse personnel action. Thus, regarding the only potential adverse personnel action that the court will be examining, the change in the plain-

tiff's duties and responsibilities, the court holds that the defendant fails to raise any exhaustion defense.

## 2. Legal Standards for Discrimination and Retaliation Under the Rehabilitation Act, Title VII, and the ADEA

■ Generally, to prevail on a claim of discrimination or retaliation under the Rehabilitation Act, Title VII, or the ADEA, a plaintiff must follow a three-part burden-shifting analysis generally known as the *McDonnell Douglas* framework. *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C.Cir. 2003). The Supreme Court has explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection".... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

---

*Fox v. American Airlines, Inc.,* 389 F.3d 1291, 1295 (D.C.Cir.2004) (holding that "[w]here the district court relies on the absence of a response as a basis for treating the motion as conceded, we honor its enforcement of the rule") (quoting *Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 577 (D.C.Cir.1997)).

To establish a prima facie case of discrimination under the Rehabilitation Act, the plaintiff must show that he (1) is an individual with a disability (2) who, with or without reasonable accommodation, can perform the essential functions of the position, and (3) who suffered an adverse employment decision due to her disability. *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C.Cir.2002); *LaCorte v. O'Neill*, 139 F.Supp.2d 45, 47–48 (D.D.C.2001) (citing *Barth*, 2 F.3d at 1186). To establish a prima facie case of race discrimination under Title VII, the plaintiff must show that "(1) [he] is a member of a protected class; (2)[he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999); *Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C.Cir.2003); *Carroll v. England*, 321 F.Supp.2d 58, 68 (D.D.C. 2004). To establish a prima facie case of age discrimination under the ADEA, the plaintiff must demonstrate "facts sufficient to create a reasonable inference that age discrimination was a determining factor in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856–57 (D.C.Cir.1982); *Miller v. Lyng*, 660 F.Supp. 1375, 1377 (D.D.C.1987). Such an inference is created if the plaintiff can show (1) he belongs to the statutorily protected age group; (2) he was qualified for his position and was performing his job well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action despite his qualifications and performance; and (4) he was disadvantaged in favor of similarly situated younger employees. *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Hall*, 175 F.3d at 1077; *Paquin*, 119 F.3d at 26 (citing *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir. 1983)). Finally, for a retaliation claim, the plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action;

and (3) there is a causal connection between the two." *Carter v. George Washington University*, 387 F.3d 872, 877 (D.C.Cir.2004).

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee. *Id.* at 254, 101 S.Ct. 1089. To rebut this presumption, the employer must articulate a legitimate, non-discriminatory reason for its action. *Id.* The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination *vel non.*" *Lathram*, 336 F.3d at 1088 (internal citations omitted). At this point, to survive summary judgment, the plaintiff "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Id.* (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C.Cir.1998)) (en banc). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further

evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia,* 298 F.3d 989, 992–93 (D.C.Cir.2002) (quoting *Aka,* 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka,* 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291.

### 3. The Change in the Plaintiff's Duties and Responsibilities Does Not Constitute an Adverse Personnel Action

█ As indicated above, as part of his prima facie case under the Rehabilitation Act, Title VII or the ADEA, the plaintiff must establish an adverse personnel action. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *Brown,* 199 F.3d at 452. In general, to determine whether an adverse personnel action occurred, the court asks whether "a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown,* 199 F.3d at 457. The plaintiff does not allege that he saw a reduction in benefits, work hours, or job-title as a result of Loman hiring Picard. Rather, the plaintiff claims that he lost many of the duties he had enjoyed for over ten years to Picard and Loman. Def.'s Mot. at 35–36. As the plaintiff states, "[u]ntil they were removed by the agency beginning in 2001, Mr. Baloch's substantive duties were essentially divided into two areas: one area is known as water rights adjudication; the second is called water resources management planning." Opp'n at 5 (footnotes omitted). However, once Picard reported to work in June 2001, the plaintiff "received no further assignments in water rights adjudication." Opp'n at 14, 28. The following year, Loman removed the plaintiff's duties in water resources management, either transferring them to Picard or personally assuming responsibility for them. *Id.* Loss of these two key duties left the plaintiff with only one "recurrent" duty: providing water resources technician training to Native Americans and Alaskan natives—a "corollary" duty that the plaintiff states was not even reflected in his job description. *Id.;* Pl.'s Statement. ¶ 12.

█ The D.C. Circuit has stated that when an employer makes a hiring decision, "[s]hort of finding that the employer's stated reason was indeed a pretext ... the court must respect the employer's unfettered discretion to choose among qualified candidates." The same standard holds true when an employer decides which of several qualified employees will work on a particular assignment. Perhaps in recognition of the judicial micromanagement of business practices that would result if we ruled otherwise, other circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour change.

*Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1556–57 (D.C.Cir.1997) (alterations in original; internal citation omitted). Other cases, which this circuit has cited with approval, *id.,* have elaborated that an adverse personnel action may occur if the change of work-related duties amounts to "*significantly diminished* material responsibilities." *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 886 (6th Cir.1996) (emphasis in original) (citing *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). As the court stated in *Kocsis,* to establish a materially adverse change in terms of employment, the plaintiff must establish that he received "significantly diminished material responsibilities, including termination of employment, demotion evidenced by a decrease in wage or salary, less distinguished title, material loss of benefits, or other

indices that might be unique to a particular situation." 97 F.3d at 886.

The court has already indicated that the plaintiff saw no reduction in economic benefits as his duties changed. Nor is this a case where the plaintiff, after years of substantive work, suddenly found himself stripped of all duties and atrophying in bureaucratic oblivion. *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994) (noting that suddenly being stuck "with nothing to do but read a good book … would be adverse for all but those completely devoid of ambition or the need to be challenged"). Of course, a situation need not be so intolerable for the court to find materially diminished responsibilities. *See, e.g., Shefferly v. Health Alliance Plan of Michigan*, 94 Fed.Appx. 275, 2004 WL 784117 (6th Cir.2004) (finding significantly diminished material responsibilities where a plaintiff lost supervisory capacity over sales representatives and faced short work hours); *Bibbs v. Bd. of Trustees For Univ. of Ill.*, 191 F.3d 455 (7th Cir.1999) (finding significantly diminished material responsibilities where the plaintiff "no longer supervises or coordinates the work of any other employees and does not have any involvement with the budget," and where the employee's "only duties are to answer telephones, do some filing, and schedule some meetings"). Nevertheless, the court is reluctant to and has little competency becoming involved in disputes over the relative substantive significance of workplace assignments. *See Russell v. Principi*, 257 F.3d 815, 818 (D.C.Cir.2001) (warning against "judicial micromanagement of business practices") (citation omitted).

The plaintiff submits that he lost the two core functions of his position—functions he had enjoyed for years—and that his employer relegated him to a duty not even in his original job description. The latter point, the heart of the plaintiff's argument, hovers somewhere between meritlessness

and bad faith—indeed, one need only consult the Department of the Interior's justification for awarding the plaintiff a $7,500 "STAR Award" bonus to discover why the duty was not in the plaintiff's job description: the plaintiff developed the training program on his own initiative. Pl.'s Ex. A; Pl.'s Ex. B (giving the plaintiff a $5,000 bonus in a separate year based at least in part on the same training program). From the size of the bonuses, one would presume the Department of the Interior was pleased with the plaintiff's training program. *Id.* In any event, the plaintiff's argument regarding "corollary" duties is unavailing: the plaintiff invents a program, receives substantial bonuses and recognition for doing so, cites the bonuses as evidence that he is a "stellar" employee, *e.g.,* Opp'n at 1, 6–7, and then complains that his employer relegated him to working on the very program he created—a program which *obviously* is not going to be present in a job description that predated the program.

Other than performing this so-called "corollary" duty, the plaintiff does not indicate how he spent his time after Picard's arrival. The plaintiff does indicate that "[f]ar more of my time was spent responding to the baseless actions taken or proposed to be taken against me by Mr. Loman or being verbally abused by him," Baloch Decl. ¶ 75, but this comment tells the court nothing regarding the qualitative nature of the work the plaintiff had at his disposal to perform after Picard's arrival and when the plaintiff was not busy filing claims against his boss. Thus, the only evidence the plaintiff presents to indicate a significant diminishment of material responsibilities is his performance of a duty not in his original job description in the place of two duties he once performed. Because the plaintiff already shot himself in the foot on the not-in-the-job-description argument, however, he leaves the court with no real sense of what he did after

Picard's arrival, just an indication of what the plaintiff was *not* doing. *Cf. Aka v. Wash. Hosp. Center,* 156 F.3d 1284, 1291 (D.C.Cir.1998) (noting that "[i]f a plaintiff shoots himself in the foot [by contradicting his explanations], surely there is no point in sending the case to the jury").

Looking to the factors unique to the plaintiff's particular situation, 97 F.3d at 886, and making all reasonable inferences in favor of the plaintiff, the court therefore determines that the plaintiff fails to show significantly diminished material responsibilities and thus fails to show an adverse personnel action. The court reiterates that the plaintiff does not provide evidence of a removal of supervisory duties, *Stewart v. Ashcroft,* 352 F.3d 422, 427 (D.C.Cir. 2003), a "deskilling" of his position and/or correspondent increase in qualitatively inferior work, *Dahm,* 60 F.3d at 255, or a sudden lack of work, *id.* at 257. *Cf. Fortier v. Ameritech Mobile Comm.,* 161 F.3d 1106, 1111 n. 7 (7th Cir.1998) (noting on the issue of adverse personnel action that "[t]here is no evidence that the job responsibilities that Mr. Fortier was left with (safety and security) required less skill than his previous combination of duties. In fact, when he was first given the safety and security function, it was viewed as an opportunity for advancement in the company"). With no similar evidence from the plaintiff of significantly diminished material responsibilities, the court cannot hold that an adverse personnel action occurred. Accordingly, the court grants summary judgment to the defendant on the plaintiff's Rehabilitation Act, Title VII, and ADEA discrimination and retaliation claims based on discrete acts.

## C. Hostile Work Environment

### 1. Legal Standard for Discrimination Claims Based on Hostile Work Environment

▪ Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, or national origin. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Toward that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Such an environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary,* 351 F.3d at 526. (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. 2399). On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Thus, to determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance. *Id.* at 23, 114 S.Ct. 367; *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In considering the totality of the circumstances, however, the court is mindful that:

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee,* 265 F.Supp.2d. 52, 63 (D.D.C.2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002)).

 To establish a prima facie case of hostile work environment, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it. *Lester v. Natsios,* 290 F.Supp.2d 11, 22 (D.D.C.2003); *Crenshaw v. Georgetown University,* 23 F.Supp.2d 11, 15 (D.D.C.1998); *Jones v. Billington,* 12 F.Supp.2d 1, 11 (D.D.C.1997). Finally, although there is authority that the *McDonnell Douglas* framework does not apply to hostile work environment claims,[4] the D.C. Circuit appears to have endorsed application of the *McDonnell Douglas* framework to claims based on hostile work environment. *Duren v. Washington Metropolitan Area Transit Authority,* 2004 WL 2857273, *1 (D.C.Cir.2004); *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir.2002).

### 2. The Plaintiff Fails to Establish an Objectively Hostile or Abusive Work Environment

 The plaintiff alleges a hostile work environment that began in December 2000 and lasted until January 2004. Pl.'s Statement ¶ II. The defendant challenges the plaintiff's hostile work environment allegation on two grounds: that the plaintiff's work environment was not sufficiently hostile and that the plaintiff cannot show any connection between Loman's actions and discriminatory intent. Def.'s Mot. at 39. The court need not reach the second argument because it holds that the plaintiff fails to establish an objectively hostile or abusive work environment.

To recount briefly the facts of this case, Loman "exploded" at the plaintiff over the phone in December 2000, Baloch Dep. at 45–48; yelled at the plaintiff on multiple occasions in March 2001, Pl.'s Statement ¶ II.L; *see also id.* ¶¶ II.N–P; threatened a criminal investigation of the plaintiff in June 2001, *id.* ¶¶ 20–21; and issued a letter of reprimand to the plaintiff in December 2001, *id.* ¶ II.D. The plaintiff comes forward with hardly any events in 2002 except for a January letter of counseling and the claim regarding removal of duties that this court has already addressed. Compl. at 9; Pl.'s Statement ¶¶ I.E–G.

Moving on to 2003 and January 2004, Loman yelled at the plaintiff and restricted the plaintiff's leave in February 2003, Pl.'s Statement ¶ 30; Baloch Decl. ¶ 90; yelled at the plaintiff and issued him a letter of counseling in March; yelled at the plaintiff, issued a letter of reprimand, and commenced fact finding procedures regarding the plaintiff in April, Pl.'s Statement ¶ 24; re-issued restrictions on the plaintiff's use of sick leave and subjected

---

4. *Henson v. City of Dundee,* 682 F.2d 897, 905 n. 11 (11th Cir.1982) (stating that courts "should employ normal principles of pleading and proof allocation" for hostile work environment claims); *Lewis v. Forest Pharm.,* 217 F.Supp.2d 638, 653 (D.Md.2002); *Copeland v. Rosen,* 38 F.Supp.2d 298, 306 (S.D.N.Y.1999) (holding that, "[u]nlike plaintiff's hostile work environment claim, which on a motion for summary judgment simply involves an assessment of the totality of the circumstances presented, plaintiff's retaliation claim is subject to the more cumbersome three-part, burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas* "); *Ferraro v. Bell Atlantic Co., Inc.,* 2 F.Supp.2d 577, 585 n. 4 (D.N.J.1998) (same); *Dickerson v. State of N.J. Dept. of Human Services,* 767 F.Supp. 605, 613 (D.N.J.1991) (stating that "the courts which have examined the theory of hostile work environment in the context of Title VII have not proceeded using the analysis outlined in *McDonnell Douglas* ").

the plaintiff to another profanity session in August, *id.* ¶¶ II.G–H; issued a memorandum of proposed suspension for two calendar days in September, *id.* ¶ 36; gave the plaintiff a bad review, yelled at him about travel requests, and threatened to have the plaintiff arrested, handcuffed, and incarcerated in October, *id.* ¶ 37; and issued a proposal to suspend the plaintiff for thirty days in January 2004, *id.* ¶ II.

As indicated above, in determining whether harassment rises to the level of a hostile work environment, courts consider the frequency of the harassing conduct, its severity, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The first problem the court faces is one of frequency—how to handle the relative absence of actionable incidents in 2002. Arguably this absence prevents the plaintiff from stringing together incidents occurring between December 2000 and January 2004 to show an environment *permeated* with "discriminatory intimidation, ridicule and insult" during the periods of time in question. *Singletary,* 351 F.3d at 526; *see also Harris,* 510 U.S. at 21–23, 114 S.Ct. 367. The court is aware, however, that *Harris* instructed courts to consider whether conduct is pervasive *or* severe, and that severity can in essence compensate for a lack of pervasiveness, despite the fact that isolated or occasional episodes rarely merit relief. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 440 (2d Cir.1999). Conceivably, therefore, sufficiently severe conduct could overcome the relative calm in 2002.

The plaintiff does not establish sufficiently severe conduct that would compensate for his failure to establish pervasive conduct. As an initial matter, the court dispenses with any suggestion that Loman's use of the works "fuck" or "shit" talismanically creates a hostile environment. Certain words approach such status, *cf. Torres v. Pisano,* 116 F.3d 625, 632–33 (2d Cir.1997) (holding that a supervisor who, *inter alia,* referred to an employee as a "dumb cunt" and a "dumb spic" created a hostile work environment), but in the absence of discriminatory overtones, the court rarely polices jejune workplace profanity. *See Alfano,* 294 F.3d at 377 (cautioning against courts becoming superpersonnel departments).

Furthermore, Loman's threats (one in 2001 and one in 2003) regarding criminal prosecution and/or arrest, although possibly exceeding the "ordinary tribulations of the workplace," *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), do not overcome the absence of actionable activity in 2002. Thus, the court is largely left with isolated incidents of what one might call a "nasty" supervisor and a claim of a hostile work environment where almost one-third of the alleged time-span of that hostile environment lacks actionable activity. *Cf. Freedman v. MCI Telecomm. Corp.,* 255 F.3d 840, 849 (D.C.Cir.2001) (stating that "[a] mere 'nasty' attitude exhibited by a supervisor is insufficient to establish a hostile atmosphere, especially where, as here, there is no evidence that the 'nasty' attitude is pervasive and constant"). The court will not restyle the plaintiff's hostile work environment claim as one beginning in 2003 (a claim that may have done better); instead, the court works with what the plaintiff alleged in his complaint—a hostile work environment between December 2000 and January 2004—and holds that the absence of actionable activity in 2002 defeats that claim.

### 3. The Court Grants the Plaintiff Leave to Amend his Complaint For the *Limited* Purpose of Including a Claim of Retaliation Based on Hostile Work Environment

■ In his opposition, the plaintiff appears to raise, for the first time, a claim of retaliation based on hostile work environment. Opp'n at 4 (noting that the alleged hostile work environment was based in part on retaliation). This otherwise cognizable claim (to which the defendant did not file a reply) is not properly before the court because it was not in the plaintiff's complaint. *Kilpatrick v. Paige,* 193 F.Supp.2d 145, 158 (D.D.C.2002) (deeming a claim in an opposition to a motion for summary judgment "invalid because it was not made in the original complaint or advanced in a motion to amend"); *see also Quarles v. General Investment & Development Co.,* 260 F.Supp.2d 1, 13 n. 6 (D.D.C. 2003) (stating that "whether plaintiffs can amend their complaint through a statement in their opposition is a dubious proposition at best"). Nevertheless, in the interest of justice the court grants the plaintiff leave to amend his complaint for the limited purpose of bringing such a claim. FED.R.CIV.P. 15(a).

### IV. CONCLUSION

For the foregoing reasons the court grants in part the defendant's motion for summary judgment and grants the plaintiff leave to amend his complaint to include a claim for retaliation based on hostile work environment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued on this 13th day of January, 2005.