# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 4, 2010　　　　　Decided April 16, 2010

No. 08-5155

JOSE PARDO-KRONEMANN,
APPELLANT

v.

SHAUN L. S. DONOVAN, SECRETARY OF HOUSING AND URBAN
DEVELOPMENT,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00626)

*John F. Karl Jr.* argued the cause and filed the brief for appellant. *Kristen G. Hughes* entered an appearance.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Senior Circuit Judge* WILLIAMS.

TATEL, *Circuit Judge*: Appellant, an attorney at the Department of Housing and Urban Development, alleges that HUD retaliated against him in violation of Title VII of the Civil Rights Act of 1964 by transferring him to a non-legal position and by declaring him absent without leave (AWOL) when he failed to report to his new job. After partially denying appellant's Rule 56(f) motion, the district court granted summary judgment to HUD on both claims. For the reasons set forth in this opinion, we reverse as to the transfer claim, affirm as to the AWOL claim, and find no abuse of discretion in the district court's resolution of the Rule 56(f) motion.

## I.

Appellant Jose Pardo-Kronemann first worked at HUD as a graduate student intern in the Office of International Affairs (OIA). After completing law school in 1991, he returned to HUD as an entry-level attorney in the Office of the General Counsel (OGC), first in the Public Housing Division and then in the Finance Division, his preferred position. Sometime in 1998 or 1999, HUD reassigned Pardo-Kronemann to OGC's Program Compliance Division.

Around this time, Pardo-Kronemann filed several Equal Employment Opportunity (EEO) complaints alleging retaliation for prior EEO activity and discrimination on the basis of his Cuban origin. He also asked Howard Glaser, counselor to HUD Secretary Andrew Cuomo, about a possible detail away from HUD. In a subsequent letter, Glaser noted that Pardo-Kronemann had requested a one-year detail and that, upon his return, he sought reinstatement "preferably to the . . . Office of International Affairs or the . . . Finance

Division [of OGC]." Letter from Howard Glaser, Counselor to the Secretary, HUD, to Jose Pardo-Kronemann (July 21, 1999). The letter stated that "the Department is agreeable to a detail . . . renewable to the permissible extent," and that "[a]t the conclusion of the detail, [Pardo-Kronemann] would return to [his] position at HUD or a mutually agreeable position, including consideration for reassignment to the Finance Division." *Id.*

In accordance with Glaser's letter, HUD approved a one-year detail to the Inter-American Development Bank (IDB) from November 1999 to November 2000. At the conclusion of that detail, Pardo-Kronemann sought a second detail, this time to the Inter-American Investment Corporation. When HUD said no, Pardo-Kronemann took approved leave without pay from December 2000 to February 2001. During that time, he continued working on a handbook for fostering mortgage markets in developing nations that he had begun while on detail at IDB.

Returning to HUD in March 2001, Pardo-Kronemann met with Matthew Hunter, Assistant HUD Secretary and White House Liaison, and asked him for either a second detail or a political appointment in the new administration. During that meeting, Pardo-Kronemann gave Hunter copies of his previously filed EEO complaints. Hunter Aff. ¶ 4, Nov. 11, 2002. Hunter "saw no reason to spend additional HUD money on detailing" Pardo-Kronemann away from the Department and concluded that "a political appointment would not be appropriate." *Id.* ¶ 7.

HUD then returned Pardo-Kronemann to OGC, though with the Department's permission, he continued working on the IDB handbook from March through October. During this time, OGC assigned Pardo-Kronemann no legal work, nor did

he request any, though he did receive a small number of assignments from the Office of the Secretary. In particular, Hunter asked Pardo-Kronemann to prepare a memorandum on the history of OIA, where he had worked as an intern during graduate school. Hunter found the final product disappointing, but Pardo-Kronemann contends that another employee actually completed the memorandum. *Id.* ¶ 6; Pardo-Kronemann Dep. 152–55 (undated).

HUD officials soon became concerned that Pardo-Kronemann "was not doing any work, was keeping sporadic work hours, and was generally not living up to his obligation as a Federal employee." Hunter Aff. ¶ 8. Sometime between June (according to Pardo-Kronemann) and September 2001 (according to HUD), HUD officials began to consider transferring Pardo-Kronemann out of OGC. On October 15, with the decision nearly final, Deputy General Counsel George Weidenfeller sent an email to several OGC employees stating "Per Matthew Hunter, please prepare papers to reassign Jose [Pardo-Kronemann] to the HUD International Affairs Office." E-mail from George Weidenfeller, Deputy General Counsel, HUD, to Sinthea Kelly and Kathryn J. Davis, HUD (Oct. 15, 2001). According to record evidence, HUD officials, including Weidenfeller and Hunter, made the transfer decision without consulting Pardo-Kronemann and over the objection of the Deputy Assistant Secretary in charge of OIA, Shannon Sorzano, who was instructed to "write a position description and find something for [Pardo-Kronemann] to do." Sorzano Aff. ¶ 5, Nov. 9, 2002. OGC and human resources officials subsequently rewrote that job description "to ensure that the duties did not reflect performance of any legal work." *Id.* ¶ 15.

Pardo-Kronemann learned nothing of the impending transfer until December. Although his position description

was still being drafted, he was instructed to report to OIA on January 7, 2002. He then met with Sorzano, who informed him that OIA focused on research and had no legal work. When Pardo-Kronemann indicated that he wanted to decline the "offer," Sorzano responded that she did not know whether he could. *Id.* ¶ 11. Pardo-Kronemann then sought leave for his first week at OIA, but he followed the wrong procedures. *Id.* ¶ 12–13. When Pardo-Kronemann failed to report for work, Sorzano placed him on AWOL status, resulting in a two-day suspension. He began work at OIA two days later. Pardo-Kronemann's title, grade, pay, and benefits remained unchanged.

After exhausting his administrative remedies before the Equal Employment Opportunity Commission, Pardo-Kronemann sued the HUD Secretary in the United States District Court for the District of Columbia. He alleged that HUD violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by transferring him to a non-legal position and by placing him on AWOL status, both in retaliation for his prior EEO activity and advocacy "on behalf of IMAGE," "an organization whose mission is to promote and increase hiring, promotion, and retention of Hispanics in the federal government." Compl. ¶ 34, 16. Following discovery and the partial denial of Pardo-Kronemann's Rule 56(f) motion for additional discovery, the district court granted HUD's motion for summary judgment on both claims. *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210 (D.D.C. 2008). Pardo-Kronemann appeals.

## II.

We begin with Pardo-Kronemann's claim of retaliatory transfer. Examining the evidence in accordance with *McDonnell Douglas*'s burden-shifting framework, the district court found that Pardo-Kronemann probably established the

first two elements of a prima facie case of retaliation: HUD concedes that his EEO complaints qualified as statutorily protected activity, and the record reflects a "genuine dispute of material fact as to whether he suffered an adverse personnel action based upon the reassignment" to a non-legal position. *Pardo-Kronemann*, 541 F. Supp. 2d at 215–18; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The district court expressed some doubt that Pardo-Kronemann could satisfy the third requirement—a causal connection between his 1999 EEO complaints and his late 2001 transfer. But because HUD had already offered a "legitimate, non-discriminatory reason" for the reassignment—a desire to place Pardo-Kronemann in an office where he would be happier and more productive—the district court properly ruled that the *McDonnell Douglas* burden-shifting framework "effectively evaporate[d]." *Pardo-Kronemann*, 541 F. Supp. 2d at 215; *see, e.g.*, *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). Thus, "the sole remaining question" became "retaliation *vel non*"—whether, based on all the evidence, a reasonable jury could conclude that HUD's proffered reason for the transfer was pretext for retaliation. *Pardo-Kronemann*, 541 F. Supp. 2d at 219; *see Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009). Emphasizing that Pardo-Kronemann had failed to seek legal work in his first eight months back at OGC, the district court concluded that no reasonable jury could find HUD's proffered reason for the transfer pretextual. *Pardo-Kronemann*, 541 F. Supp. 2d at 220–21.

We review the district court's decision de novo. *See, e.g.*, *Carter*, 387 F.3d at 878. "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a

judgment as a matter of law.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). We review the evidence in the light most favorable to the non-moving party—here, Pardo-Kronemann—and draw all reasonable inferences in his favor. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, we do not "determine the truth of the matter," but instead decide only "whether there is a genuine issue for trial." *Id.* at 249.

Because HUD has proffered a legitimate reason for the transfer, we, like the district court, focus on "whether a reasonable jury could infer . . . retaliation from all the evidence." *Jones*, 557 F.3d at 677 (quoting *Carter*, 387 F.3d at 878) (omission in original) (quotation marks omitted). In doing so, "[we] review[] each of the three relevant categories of evidence—prima facie, pretext, and any other" to determine whether the evidence creates a genuine dispute on the "ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 679, 678 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (alteration in original)). Although "evidence of pretext is not *per se* sufficient to permit an inference" of retaliation, it "'[u]sually . . . will be enough to get a plaintiff's claim to a jury.'" *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (omission in original)); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) ("In an appropriate case, 'the factfinder's disbelief of the reasons put forward by the

defendant' will allow it to infer intentional discrimination.") (internal citation omitted).

HUD argues that the district court got it exactly right. In support, it maintains that no reasonable jury could possibly conclude that the Department had retaliated against Pardo-Kronemann because, after all, it reassigned him to the very office where he wanted to work, the Office of International Affairs. *See* Letter from Howard Glaser, Counselor to the Secretary, HUD, to Jose Pardo-Kronemann (July 21, 1999) (noting that, when requesting the detail, Pardo-Kronemann sought "[r]eassignment to HUD at the end of the detail period, preferably to the HUD Office of International Affairs or the [OGC] Finance Division"). But this case is not quite so simple. Pardo-Kronemann points to several pieces of evidence that could convince a reasonable jury that HUD transferred him to OIA not to make him happier and more productive, but rather in retaliation for his EEO activities.

Most important, Pardo-Kronemann relies on Hunter's testimony during the EEOC administrative hearing. While discussing the several meetings leading up to the transfer, Hunter engaged in the following exchange with Pardo-Kronemann's counsel:

> Q. Was the fact that the complainant had prior EEO activity a reason or a fact in your suggesting that he be reassigned to the Office of International Affairs?
> A. No.
> Q. Did you know at the time of the meeting referred to here that he had prior EEO activity?
> A. *No.* I mean I would know—*I would not have referred someone who might be viewed as a problem to another office to create another problem*, I wouldn't have done that. I mean that was an

important office for the Secretary, . . . it was someone [sic] we were not trying to put the B team or C team, we were looking for an A team down there.

Transcript of EEO Hearing at 51–52, *Pardo-Kronemann v. Martinez*, EEOC Case No. 100-2003-07306X (Sept. 8, 2004) (emphasis added).

We agree with Pardo-Kronemann that this testimony could well lead a reasonable jury to question Hunter's credibility and therefore the legitimacy of HUD's proffered reason for the transfer. For one thing, when answering "no" to the question "did you know at the time of the meeting referred to here that he had prior EEO activity," Hunter was flatly contradicting his earlier statement that when he and Pardo-Kronemann met months before the reassignment, Pardo-Kronemann gave him copies of his EEO complaints. *See* Hunter Aff. ¶ 4. Moreover, the rest of the answer—"I would not have referred someone who might be viewed as a problem to another office to create another problem"— particularly when combined with Hunter's false denial of knowledge of the EEO complaints, could be interpreted by a reasonable jury as "yes, had I known about Pardo-Kronemann's EEO complaints, I never would have referred such a 'problem' employee to another office"—precisely what Title VII prohibits. HUD believes that any such inference is "more than counterbalanced by [Hunter's] statement that he was trying to send an 'A' team player to OIA." Appellee's Br. 37. Perhaps so, but given the fact that Hunter held Pardo-Kronemann responsible for poor work on the OIA memorandum, a reasonable jury might well wonder whether he really was seeking to assemble an "A team" at OIA, or whether he was in fact ridding OGC of a "problem" employee. True, Hunter's statements could be interpreted

more innocently, but resolving such conflicting inferences is a "jury function, not [one] of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

Other record evidence reinforces our conclusion that a reasonable jury could find that HUD's proffered reason for transferring Pardo-Kronemann was in fact pretext for retaliation. First, in 1999, when Pardo-Kronemann told Glaser of his interest in working at OIA, the office had at least $10 million in grant funding for relief programs. By 2001, the parties agree, it had exhausted that funding, and OIA had "no role . . . other than to do research." Pardo-Kronemann Dep. 14, June 30, 2006. Given this, Pardo-Kronemann contends, a reasonable jury could conclude that HUD management did not "honestly and reasonably believe[]" that he would still want to work at OIA at the time of the transfer. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) (emphasizing that the relevant question in pretext analysis is whether the employer reasonably and honestly believes in the asserted reason for employment action). We agree, particularly since no one at HUD even asked Pardo-Kronemann whether his preferences had changed since 1999. Of course, "[n]othing in the law requires an employer to consult with an employee before assigning new duties." Appellee's Br. 32–33. But we think a reasonable jury might well wonder why HUD officials failed to consult Pardo-Kronemann if they were truly interested in finding him a job that would make him happier.

Second, when Sorzano first learned that HUD officials might transfer Pardo-Kronemann to OIA, she told Hunter that the office had no attorney positions and that the prospect of a transfer "was not looking good." Sorzano Aff. ¶ 4. A couple of months later, and at least a month after the transfer decision was made, Larry Thompson, General Deputy Assistant

Secretary for Policy Development and Research, told Sorzano that Pardo-Kronemann would be transferred and directed her "to write a position description and *find something for him to do*." *Id.* ¶ 5 (emphasis added). If HUD officials really were seeking to improve Pardo-Kronemann's productivity, why, a reasonable jury might ask, would they have transferred him over the objection of his soon-to-be supervisor to an office with no legal work?

Third, Sorzano states in her affidavit that "[t]hroughout this matter [she] ha[s] never been informed of the Office of General Counsel's basis for reassigning Mr. Pardo-Kronemann." *Id.* ¶ 17. Indeed, when Thompson first told Sorzano of the transfer, she asked for an explanation, but Thompson responded only that "the decision has been made." *Id.* ¶ 6. When Sorzano contacted three other HUD officials to object to the reassignment, each told her that the decision had been made but offered no explanation. *See id.* (Carole Jefferson, Deputy Assistant Secretary for Administration, told Sorzano that "the decision was out of her hands and had already been made"); Sorzano Dep. 9, Nov. 2, 2007 (Dan Murphy, Chief of Staff to HUD Secretary Mel Martinez, said that the transfer "was already decided. It was a done deal"); Sorzano Aff. ¶ 7 (Hunter told Sorzano for the second time without explanation that "the matter had been decided"). We agree with Pardo-Kronemann that a reasonable jury could conclude from this evidence that HUD officials were seeking to conceal a retaliatory motive.

To sum up, Hunter's questionable EEO testimony, HUD officials' failure to discuss the transfer with Pardo-Kronemann, and Sorzano's inability to obtain an explanation for the reassignment would allow a reasonable jury to conclude that HUD transferred Pardo-Kronemann to OIA not to make him happier and more productive, but in retaliation

for his prior EEO activity. In saying this, we reiterate that our job at this stage of the litigation is not to evaluate the evidence or to decide whether Pardo-Kronemann was in fact a victim of unlawful retaliation, but only to determine whether the record contains sufficient evidence for a reasonable jury to so conclude. Because it does, summary judgment for HUD was inappropriate.

## III.

Our dissenting colleague would affirm on the ground that Pardo-Kronemann has failed to establish one of the required elements of a prima facie case of retaliation: that the transfer "constitutes an adverse employment action," *Holcomb*, 433 F.3d at 902. As an initial matter, we note that HUD raises this argument only in what HUD counsel described as a "relatively limited" footnote, Oral Arg. at 30:10; *see* Appellee's Br. 38 n.10, and that we have on occasion considered such arguments forfeited, *see, e.g.*, *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 93 n.3 (D.C. Cir. 2002). In any event, we agree with the district court that Pardo-Kronemann has raised a genuine issue of material fact as to whether his transfer from OGC to OIA qualifies as an adverse employment action.

An employment action is materially adverse where it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Lateral transfers—those entailing "'no diminution in pay and benefits'"—qualify as adverse employment actions if they result in "'materially adverse consequences affecting the terms, conditions, or privileges'" of the plaintiff's employment. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C.

Cir. 2003) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). Although we have stated that "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action," *Brown*, 199 F.3d at 455–56 (internal quotation marks omitted); *see* Dissenting Op. at 17, we have also held that "[w]hether a particular reassignment of duties constitutes an adverse action . . . is generally a jury question," *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007). Indeed, "[t]he court may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities." *Id.* (concluding that a jury could find adversity where, after a lateral transfer, plaintiff supervised fewer employees and managed a smaller budget). Thus, as the Supreme Court has held, transfers resulting in no decrease in pay or benefits may nonetheless be adverse. *See White*, 548 U.S. at 70 (finding that employment actions may be adverse even where "both the former and present duties fall within the same job description" because "[a]lmost every job category involves some responsibilities and duties that are less desirable than others"); *see also Holcomb*, 433 F.3d at 902 (concluding that jury could find adversity from reassignment with "significantly different responsibilities"); *Stewart*, 352 F.3d at 427 (concluding that jury could find adversity in failure to transfer plaintiff to position with same pay and benefits but involving greater supervisory duties and prospects for advancement).

Where, as here, the plaintiff alleges retaliation based on a reassignment, the fact-finder must compare the position the plaintiff held before the transfer to the one he holds afterwards. Here the parties compare the OGC position Pardo-Kronemann occupied both before and after his IDB detail to his new position at OIA. The question, then, is

whether a reasonable jury could conclude that the transfer from the former to the latter was adverse. According to HUD, the answer is no because Pardo-Kronemann's salary, benefits, and grade remained the same; indeed, he maintained the same title, switching from an Attorney Advisor in OGC to an Attorney Advisor in OIA. But we agree with Pardo-Kronemann that a reasonable jury could conclude from the job descriptions that OGC attorneys have "significantly different responsibilities" than OIA attorneys. *Holcomb*, 433 F.3d at 902 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

According to the OGC Attorney Advisor position description, Pardo-Kronemann "perform[ed] a variety of difficult and complex duties," including "provision of legal services to . . . Departmental officials"; serving as "lead attorney in major . . . litigation matters"; and "provid[ing] legal advice with respect to financial marketing issues." Position Description, Attorney Advisor, Apr. 12, 1995. Although this describes Pardo-Kronemann's job in the OGC Finance Division before being detailed to IDB, HUD does not contend that Pardo-Kronemann's duties would have been materially different had he remained in the OGC position to which he returned after the detail. In fact, HUD itself uses this position description as the basis for its comparison. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. 9; *cf. Hayes v. U.S. Postal Serv.*, 390 F.3d 1373, 1377 (Fed. Cir. 2004) (noting that "an employee continues to be the incumbent of the position from which he was detailed") (internal quotation marks and citation omitted). By contrast, Pardo-Kronemann's OIA position description looks quite different. Although stating that he "[p]rovide[s] advisory services . . . on questions of law" and "[c]onduct[s] research of laws, legal opinions, policies, regulations and related legal analyses," the position description emphasizes that "[a]ll professional legal

guidance regarding the formulation and development of the Department's international programs and activities is received from the Office of the General Counsel." Position Description, Attorney Advisor (International), Jan. 9, 2002.

It is true, as HUD counsel emphasized at oral argument, that lawyers work throughout the Department, but as the two position descriptions demonstrate, only OGC lawyers can practice law, e.g., issue legal opinions, represent the agency in administrative proceedings, and coordinate with the Department of Justice to represent HUD in court. Indeed, OGC and Human Resources personnel rewrote Pardo-Kronemann's OIA position description to ensure that his duties in that office "did not reflect performance of any legal work." Sorzano Aff. ¶ 15.

Other record evidence also indicates that the transfer from OGC to OIA amounted to a transfer from a legal to a non-legal position. In late October 2001, upon completing the IDB handbook and before he even knew about the transfer, Pardo-Kronemann asked OGC for legal work. *See* Pl.'s Decl. in Opp'n to Def.'s Mot. for Summ. J. ¶ 12. From this, a jury could reasonably conclude that absent the transfer, he would have resumed his usual legal duties as an OGC attorney. Yet as Sorzano explained, following the transfer Pardo-Kronemann's "skills and education are not being fully utilized in the Office of International Affairs." Sorzano Aff. ¶ 17. Indeed, Sorzano found herself "puzzled" upon learning that a lawyer might join her office. Sorzano Dep. 18. Moreover, "[w]hen [Pardo-Kronemann] submitted a training request for Continuing Legal Education . . . that is a condition to [his] continuing membership in the Bar of the Commonwealth of Pennsylvania, Sorzano denied the request," explaining that he "do[es] not do legal work." Pl.'s Decl. in Opp'n to Def.'s Mot. for Summ. J. ¶ 3. Similarly,

Geraghty testified that Pardo-Kronemann is doing "research," and that he is unable to issue legal documents on which HUD could rely without "the approval of the Office of the General Counsel," "[e]ven if [Pardo-Kronemann] ha[s] higher rank" than the OGC attorney granting that approval. Geraghty Dep. 45.

Given these differences between the OGC and OIA jobs, we think a reasonable jury could conclude that the transfer qualifies as an adverse employment action. We therefore have no need to consider Pardo-Kronemann's claim that his actual work at OIA is less sophisticated than suggested by the position description. *See* Pardo-Kronemann Dep. 14–15, June 30, 2006; Compl. ¶¶ 25, 27–33; Pl.'s Opp. to Mot. for Summ. J. 17 (Pardo-Kronemann was "assigned to a research job, that was similar to what he had done as an intern in [OIA] at a much lower grade level when he was paid $4.50 per hour more than twenty years earlier"); *see also Holcomb*, 433 F.3d at 902–03 (finding that a dramatic decrease in duties to below grade level could constitute adverse employment action).

The dissent has a very different view of this issue. It compares Pardo-Kronemann's new position at OIA not to his position at OGC, but to his pre-transfer, temporary work on the IDB handbook. Finding his work on the handbook similar to his work at OIA, the dissent concludes that no reasonable jury could find the transfer adverse. That, however, is not HUD's argument. Instead, as we indicate above, HUD compares Pardo-Kronemann's OIA position to his OGC position as a whole, including not just the handbook, but also the office in which Pardo-Kronemann worked and the legal work he did before the detail. Thus, in this court HUD argues only that the transfer was not adverse because Pardo-Kronemann's pay and level of work remained

unchanged. In the district court, HUD likewise compared Pardo-Kronemann's OIA position to the OGC position, though there it argued that the transfer was not adverse because he "continue[d] to perform legal work." Def.'s Mem. in Supp. of Mot. for Summ. J. 9. Neither here nor in the district court has HUD compared Pardo-Kronemann's OIA job to his work on the IDB handbook. Indeed, in arguing that the transfer was not adverse, HUD never even mentions the handbook. *See Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 510–11 (D.C. Cir. 2005) (noting that our usual practice is to consider only those arguments raised by the parties).

The dissent concedes that HUD has failed to argue here that the handbook is the relevant baseline. It claims, however, that HUD made the argument in the district court. First, the dissent relies on HUD's motion in support of summary judgment, in which it stated:

> Plaintiff alleges that the reassignment was an adverse action because it resulted in a *change* in his duties as an attorney. ("…Plaintiff was reassigned from his position as an attorney with the OGC to his current position as a de facto program analyst." *See* Compl. ¶ 25.) The record reflects that from March until December 2001, Plaintiff had no job description and it is unclear to whom exactly he was to have been reporting substantively. He was performing no work for OGC, but OGC maintained his time and attendance records.

Def.'s Mem. in Supp. of Mot. for Summ. J. 7 (citations omitted). But this passage merely recites the facts and summarizes Pardo-Kronemann's claim as a general matter—that the transfer from OGC to OIA had a negative impact on

his duties as an attorney. The paragraph says nothing about which pre-transfer duties provide the relevant baseline and, as noted above, never refers to the handbook. What's more, in pointing out that "OGC maintained [Pardo-Kronemann's] time and attendance records" immediately before the transfer, the cited passage makes clear that Pardo-Kronemann retained a position in OGC during this time. This fact is undisputed: HUD concedes that Pardo-Kronemann's 2001 transfer was "from an Attorney position in the OGC" to a position in OIA. Def.'s Statement of Material Facts Not in Dispute ¶ 14.

Moreover, both before and after the quoted language—which, again, we cite only because the dissent relies on it—HUD itself compared the OIA position to Pardo-Kronemann's OGC work more generally. On the very same page, HUD noted that "during his tenure in OGC, as a general attorney, Plaintiff reported to various Assistant General Counsel and advised differing client sub-agencies." Def.'s Mem. in Supp. of Mot. for Summ. J. 7 (citation omitted). On the next page, HUD stated that after the transfer, "[t]he nature of [Pardo-Kronemann's] work may have changed, insofar as he may be advising the [Deputy Assistant Secretary for International Affairs] *rather than a client HUD component*. But, there is no evidence that there was a reduction in his responsibilities when Plaintiff was laterally transferred to OIA." *Id*. at 8 (emphasis added). Completely missing from this discussion is any argument that Pardo-Kronemann "was not providing 'advisory services . . . on questions of law' *before* the transfer either," Dissenting Op. at 13 (quoting Position Description, Attorney Advisor (International), Jan. 9, 2002). Instead, HUD argued that "[d]ue to the similarities and comparability of the *OGC attorney position* (where plaintiff last had a position description) and the OIA International Attorney-Advisor position, and the lack of any loss of salary or benefits,

Plaintiff cannot establish that his reassignment constituted an adverse action." Def.'s Mem. in Supp. of Mot. for Summ. J. 9 (emphasis added). Indeed, HUD assured the district court that the move was not adverse because Pardo-Kronemann "continue[s] to perform legal work" at OIA. *Id*. at 9; *see also id*. at 10.

The dissent also relies on a passage in HUD's reply brief. *See* Dissenting Op. at 5. Although district courts, like this court, generally deem arguments made only in reply briefs to be forfeited, *see, e.g.*, *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008), the cited language likewise fails to make the dissent's argument. Again saying nothing about the handbook, HUD simply reiterated the fact that immediately before the transfer, Pardo-Kronemann "had not been reporting to any particular component of the Department." Def.'s Reply in Supp. of Mot. for Summ. J. 6. HUD went on to cite a number of cases for the proposition that a plaintiff's mere unhappiness with a new assignment does not in itself prove that an action was adverse. Although that is certainly correct, we can find no argument in the quoted paragraph—or, for that matter, anywhere else in the reply brief—that the appropriate baseline consists solely of the IDB handbook.

In sum, HUD argued neither that the handbook is the proper basis for comparison nor that we must disregard the fact that immediately before the transfer, Pardo-Kronemann maintained a position in OGC. Pardo-Kronemann, moreover, did not "fudge[] the matter," Dissenting Op. at 5. Instead, throughout his district court brief, Pardo-Kronemann compared his OIA job to his OGC position generally, arguing that "removing an attorney like Pardo-Kronemann from his position as an attorney qualifies as an 'adverse action,'" Pl.'s Opp'n to Mot. for Summ J. 20, because in OIA, he "has no

clients who seek his legal advice and does not perform any legal work," *id*. at 17. *See also id.* ("Sorzano's Affidavit makes it clear that the position in OIA was not comparable to that Pardo-Kronemann previously held in OGC."); *id*. at 18 ("Pardo-Kronemann was placed in a position that was manufactured specifically for him to justify his removal from OGC."). The point, then, is that following the IDB detail, Pardo-Kronemann returned to a permanent OGC position and worked on a temporary assignment. Because a jury could reasonably find that unlike the OGC position, the OIA position provides no opportunity for legal work, a question of material fact exists as to whether the transfer from OGC to OIA was adverse.

## IV.

We can easily dispose of Pardo-Kronemann's two remaining challenges. First, he contends that the district court erred in granting summary judgment to HUD on his retaliatory AWOL claim. Second, he argues that the district court abused its discretion in denying in part his Rule 56(f) motion for additional discovery.

### *Retaliatory AWOL*

On the last business day before Pardo-Kronemann's transfer was to take effect, he sought leave from OGC and submitted a copy of the request to OIA. Although an OIA administrator informed Pardo-Kronemann that he needed Sorzano's approval, he never sought it. Instead, he failed to report for work on the following Monday, at which point Sorzano, after consulting with Human Resources, placed him on AWOL status, resulting in a two-day suspension. As one might expect, HUD's proffered non-retaliatory reason for this action is that Pardo-Kronemann was in fact absent without

leave. The district court concluded that no reasonable jury could find this explanation pretextual.

Although acknowledging that he failed to seek Sorzano's approval for leave, Pardo-Kronemann insists that a reasonable jury could find that HUD marked him AWOL in retaliation for his EEO activity. He claims that Sorzano had no legitimate business reason for placing him on AWOL status because his position description remained unfinished and OIA had no work for him to do. Yet Sorzano explained that she marked Pardo-Kronemann AWOL because "as a GS-14 attorney with over 12 years of government experience, he should have known how to apply for leave through the proper channels." Sorzano Aff. ¶ 13. In addition, Sorzano believed that "approving his leave under these circumstances would set a bad precedent for other employees." *Id.* This strikes us as an entirely legitimate business purpose, and Pardo-Kronemann offers nothing to suggest that a reasonable jury could think otherwise.

Pardo-Kronemann next argues that a jury could infer retaliation from the fact that John Geraghty, his OIA supervisor, told him that the decision "came from the Tenth Floor," where the Office of the Secretary and OGC are located, and that Pardo-Kronemann had "some pretty powerful enemies" there. Pl.'s Decl. in Opp'n to Def.'s Mot. for Summ. J. ¶ 10–11. But Pardo-Kronemann never claims that Geraghty had firsthand knowledge of how the AWOL decision was made. Like the district court, we thus agree with HUD that Geraghty's statements "reflect[] at most a personal opinion or sympathy," Appellee's Br. 46, insufficient for a reasonable jury to conclude that HUD's explanation is pretext for retaliation. *See Haynes v. Williams,* 392 F.3d 478, 485 (D.C. Cir. 2004) ("The possibility that a jury might speculate

in the plaintiff's favor is insufficient to defeat summary judgment.").

*Rule 56(f) Motion*

After almost eight months of discovery, Pardo-Kronemann's original trial counsel fell ill, and the district court extended discovery through February 2007. HUD then moved for summary judgment in March, and Pardo-Kronemann obtained new counsel in May. In June, having yet to file his response to HUD's summary judgment motion, Pardo-Kronemann's new counsel moved for additional discovery under Rule 56(f), which states that a district court may grant more time for discovery "[i]f a party opposing [summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). Specifically, Pardo-Kronemann sought to depose five additional witnesses and to require those witnesses to produce all emails referring to him, though he later narrowed the request for Sorzano's emails. *See* Pl.'s Reply in Supp. of Mot. Pursuant to Rule 56(f). Granting the motion in part, the district court allowed Pardo-Kronemann to depose the three witnesses "whose depositions were noticed by plantiff's previous counsel." *Pardo-Kronemann v. Jackson*, No. 05–626 (D.D.C. Oct. 2, 2007) (order granting in part and denying in part Rule 56(f) motion). The district court denied discovery of the e-mails. We review this decision for an abuse of discretion. *See Hussain v. Nicholson*, 435 F.3d 359, 363 (D.C. Cir. 2006). As we have said, district courts enjoy "broad discretion in structuring discovery," *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991), and appellate courts "are especially reluctant to interfere with [their] decisions regarding their own day-to-day operations," *Hussain*, 435 F.3d at 363.

On appeal Pardo-Kronemann argues that the district court erred by failing to explain its reasons for denying discovery of the emails. In support, he points to our previous statement that "[w]hen 'we review a district court's decision . . . for an abuse of discretion, it is imperative that a district court articulate its reasons.'" *McCready v. Nicholson*, 465 F.3d 1, 15 (D.C. Cir. 2006) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1410 (D.C. Cir. 1996)). Here, however, the district court's rationale, though not explicitly stated, is quite apparent: the court allowed Pardo-Kronemann to complete discovery that counsel had already scheduled (the three depositions) but barred any new discovery (the other two depositions and the emails). *Cf. Nat'l Children's Ctr.*, 98 F.3d at 1410 (remanding where this court was "unable to discern" the district court's reasoning). After ten months of discovery, including multiple extensions, this decision hardly amounted to an abuse of discretion.

## V.

We reverse the grant of summary judgment to HUD on the retaliatory transfer claim, but affirm with regard to the retaliatory AWOL claim and the denial of additional discovery.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, dissenting: My colleagues appear to address the contentions of the defendant Department of Housing and Urban Development with what one might call a "magic words" approach, reminiscent of the old writ system. They quote a passage from HUD's brief in district court, making what seems like a clear argument, and then declare that it "says nothing about" the only topic it discusses. Maj. Op. at 18. This enables the majority to apply a notion of "adverse action" for purposes of retaliation claims under Title VII that is both unprecedented and entirely unjustified by reference to the text, purpose, or normal operation of the statute.

In its papers before the district court, HUD took a prosaic, obvious, almost inevitable position on the proper baseline for resolving whether plaintiff Pardo-Kronemann's allegedly retaliatory reassignment was an "adverse action." It advocated simply comparing his new position with the one he held at the time of the reassignment in January 2002:

> Plaintiff alleges that the reassignment was an adverse action because it resulted in a *change* in his duties as an attorney. (". . . Plaintiff was reassigned from his position as an attorney within OGC [Office of General Counsel] to his current position as a de facto program analyst." *See* Comp. ¶ 25.) The record reflects that from March until December 2001, Plaintiff had no job description and it is unclear to whom exactly he was to have been reporting substantively. *See* Weidenfeller Declaration, Exh. 11. He was performing no work for OGC, but OGC maintained his time and attendance records. *Id.* ¶ 7. At a management meeting, it became clear that plaintiff was not performing any work for the office of the Secretary after his return from [a position at the Inter-American Development Bank to which he had been "detailed" for a period of HUD-paid work]. *Id.* ¶ 8.

Def.'s Mem. in Supp. of Mot. for Summ. J. 7, Joint Appendix ("J.A.") 1465 (emphasis in original).

The passage seems perfectly plain.  The first sentence sets out what the brief writer perceives to be plaintiff's adverse action claim (namely, that the reassignment produced a "*change* in his duties"), and the second, third and fourth sentences point to what plaintiff was actually doing at the time of the reassignment—specifically, *no work for the Office of General Counsel*, and indeed not much else.  I cannot grasp how this can be characterized as saying "nothing about which pre-transfer duties provide the relevant baseline."  See Maj. Op. at 18.

To understand the parties' positions, as well as the majority's view, it's helpful to step back and briefly consider the chronology of events concluding in Pardo-Kronemann's allegedly retaliatory transfer:

Sometime in 1998:  Pardo-Kronemann is assigned to the Program Compliance Division of HUD's Office of General Counsel ("OGC").

April 1999:  Pardo-Kronemann files the last of several complaints of discrimination or retaliation.

November 1999:  Pardo-Kronemann is "detailed" to the Inter-American Development Bank ("IDB" or "the Bank") for six months, *at his request*.  During his time there, ultimately extended until November 2000, he works on a handbook for creation of primary and secondary mortgage markets in developing nations.

November 2000: Pardo-Kronemann seeks and is granted unpaid leave from HUD; he continues to work on the handbook.

3

March 2001: Pardo-Kronemann returns to HUD, where he is nominally assigned to OGC but is physically in the Office of the Secretary. He continues to work on the handbook, as well as on the issue of how HUD could be more effective in the international arena; he does no standard OGC legal work.

June 2001: Discussions allegedly begin among higher-level persons at HUD regarding possible assignment of Pardo-Kronemann to HUD's Office of International Affairs ("OIA").

October 15, 2001: Papers are executed for reassignment of Pardo-Kronemann to OIA—the action that he challenges as retaliatory.

October 31, 2001: Pardo-Kronemann turns in the handbook and, for the first time so far as the record discloses, states that he "would welcome legal assignments."

The majority does not assess "adverse action" by reference to the benchmark claimed by HUD (i.e., Pardo-Kronemann's role at the agency in 2001, before his assignment to OIA). Instead, it looks to the OGC job that Pardo-Kronemann occupied from 1998 until November 1999, and which he *relinquished of his own volition* more than two years before the challenged transfer. See Maj. Op. at 13.

In defense of this surprising view, the majority insists it is doing nothing more than acquiescing in HUD's own interpretation of how Title VII's retaliation provision applies to the facts of this case—however contrary to the agency's interest that interpretation may be. Maj. Op. at 13. But the majority is factually wrong: HUD cannot remotely be said to have tied its fate to the position the majority ascribes to it, let

alone to have done so sufficiently unambiguously to justify our departing from the law in deference to a senseless alternative.

The passage I've quoted at length above clearly treats the "adverse action" inquiry as turning on differences between Pardo-Kronemann's new job and the one he was doing when he was transferred. My colleagues disagree. In their view,

> this passage merely recites the facts and summarizes Pardo-Kronemann's claim as a general matter—that the transfer from OGC to OIA had a negative impact on his duties as an attorney. The paragraph says nothing about which pre-transfer duties provide the relevant baseline . . . .

Maj. Op. at 17-18. *Nothing*? The paragraph, like most legal arguments, begins by referencing a legal standard: "Plaintiff alleges that the reassignment was an adverse action because it resulted in a *change* in his duties." Def.'s Mem. in Supp. of Mot. for Summ. J. 7, J.A. 1465 (emphasis in original). Then it offers facts that are obviously selected to show that the legal standard cannot possibly be satisfied: "The record reflects that from March until December 2001, Plaintiff had no job description . . . . He was performing no work for OGC . . . . Plaintiff was not performing any work for the office of the Secretary." *Id.*

The meaning of these words seems inescapable. The defendant is saying that Pardo-Kronemann can't be said to have suffered an adverse action, because an adverse action requires adversity compared with some baseline, and the proper baseline in Pardo-Kronemann's case was the position he occupied "from March until December 2001," in which he did "no work."

As it happens, Pardo-Kronemann never took issue with that formulation. Rather, he fudged the matter, at best implicitly adopting the position that the majority now imputes to HUD, namely that the proper baseline is his work at OGC *before* November 1999, when he was "detailed" to the IDB at his request. He pointed to "his prior position as an attorney in OGC," Pl.'s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006, and went on to disparage the job in OIA as possibly not even being "a *bona fide* legal position," *id.* Given the disparagement, his OGC reference is likely intended to allude to the pre-November 1999 era when he was apparently doing conventional OGC work. In response, HUD re-asserted its view that the proper benchmark was Pardo-Kronemann's position at the time of reassignment:

> Plaintiff was placed in the OIA, when it was discovered that for several months after his return, from a detail at the IDB, he had not been reporting to any particular component of the Department and that OIA would be an appropriate match. . . . Unfortunately, from the beginning, he resisted the change . . . In *Lester v. Natsios*, 290 F. Supp. 2d 11, 29-30 (D.D.C. 2003), the court recognized that changes in responsibility are not adverse actions but constitute "ordinary tribulations of the workplace" which employees should expect. *See also Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997) ("not everything that makes an employee unhappy is an actionable adverse action") *aff'd without opn.*, 1998 WL 389101 (D.C. Cir. 1998).

Def.'s Reply in Supp. of Mot. for Summ. J. 6-7.

The majority offers just over three pages worth of reasons explaining why HUD cannot possibly be understood to have said what it said. Maj. Op. at 16-20. First is the observation that HUD conceded that OGC kept Pardo-Kronemann's time

and attendance records upon his return to the agency. Maj. Op. at 18. This is true. It is also completely consistent with the conclusion that the "adverse action" baseline the agency advocated was what Pardo-Kronemann was *doing* on his return to the agency, when OGC was keeping his time and attendance records.

Next, the majority is troubled by the fact that in the passages of HUD's district court filings that I've highlighted, the agency does not mention the handbook—which, in Pardo-Kronemann's view, was his principal project in 2001. See Appellant's Br. at 8-9; Maj. Op. at 19 ("Again saying nothing about the handbook . . ."); *id.* ("[W]e can find no argument in the quoted paragraph—or, for that matter, anywhere else in the reply brief—that the appropriate baseline consists solely of the IDB handbook."). The reason is simply that the government's papers made a stronger claim as to Pardo-Kronemann's activities in the critical period, arguing that in 2001, he "was performing no work for OGC . . . [or] for the Office of the Secretary," see Def.'s Mem. in Supp. of Mot. for Summ. J. 7, J.A. 1465. But in evaluating a motion for summary judgment we take the facts in the light most favorable to the non-moving party. Obviously a neutral judge is hardly bound to a summary-judgment seeker's rather aggressive reading of the conflicting materials. The point is that HUD looked to that period as a baseline for assessing adversity.

Finally, the majority observes that "HUD itself compared the OIA position to Pardo-Kronemann's OGC work more generally." Maj. Op. at 18. Assuming arguendo that this is true—and, moreover, that the phrase "OGC work more generally" should be construed to cover the work that Pardo-Kronemann did at OGC from 1998-1999—it shows nothing more than that HUD was covering its bases. While the agency *explicitly advocated* use of the standard "adverse

action" baseline (to wit, the employee's job at the time of the supposed retaliation), it also made a variety of contingent arguments: even if the appropriate baseline were the job Pardo-Kronemann voluntarily abandoned two years before the putative adversity struck rather than the one he was doing when it happened, the new job still couldn't be said to amount to a step down.

In fact, even if one made the further assumption that the agency didn't frame its alternative arguments as such, but simply offered conflicting perspectives on the "baseline" issue, one *still* wouldn't be able to reach the conclusion the majority adopts. In this scenario, the panel would need to choose for itself which of the two legal theories to follow, presumably on the basis of which was consistent with the law. In no case would the proper judicial response be to deliberately ignore one of the theories for no stated reason other than a fictional contention that no conflict existed between the parties.[1]

In reality, once we clear the alleged waiver out of the way, selection of the proper baseline for resolving whether the assignment was an adverse action seems quite straightforward. The question of the "adversity" required for an "action" to be retaliatory naturally depends on objective differences between the conditions before and after the change. See *Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006) (referring to "the former and present

---

[1] It is true, as the majority notes, that HUD's brief on appeal doesn't offer a perspective one way or the other on the question of what the proper baseline for comparison is in the "adverse action" analysis. Neither, for that matter, does Pardo-Kronemann—an omission the majority does not hold against *him*.

duties"); *Czekalski v. Peters*, 475 F.3d 360, 364-65 (D.C. Cir. 2007).

It is fairly easy to rule out all of Pardo-Kronemann's past positions other than his assignment at the time of the transfer to OIA.[2]  His OGC job from 1998 to November 1999, which he left voluntarily, was one he had not occupied for over two years before the allegedly retaliatory action.  See Pl.'s Statement of Material Facts in Dispute and Material Facts Omitted by Def. ("Plaintiff's Statement of Facts") at 3, J.A. 1034 (asserting that HUD detailed Pardo-Kronemann to the Bank pursuant to a settlement agreement).  And the Bank stint and the unpaid leave were clearly temporary arrangements.

Apart from HUD's supposed waiver, the majority attempts to support its approach solely by citation to a Federal Circuit opinion, *Hayes v. U.S. Postal Service*, 390 F.3d 1373, 1377 (2004), which it quotes for the proposition that "an employee continues to be the incumbent of the position from which he was detailed."  Maj. Op. at 14.  The quote from

---

[2]  By "assignment" I do not, of course, mean a particular project on which Pardo-Kronemann was working upon his 2001 return to the agency, as the majority says I do.  See Maj. Op. at 16 ("The dissent . . . compares Pardo-Kronemann's new position at OIA not to his position at OGC, but to his pre-transfer, temporary work on the IDB handbook.").  I mean, obviously, *the position he was occupying* at that time.  The majority's later statement that the "dissent concedes that HUD has failed to argue that the handbook is the relevant baseline," Maj. Op. at 17, is very much in the spirit of "When did you stop beating your wife?"  It builds in a premise that is disconnected from reality.  *No one* involved in this case, including me, has *ever* suggested that the "handbook" was itself a job or an assignment in the relevant sense of being a *position* which Pardo-Kronemann ever held.

*Hayes* is linguistically accurate, but the case has nothing to do with determining the baseline for evaluation of whether an action is adverse for purposes of Title VII retaliation. *Hayes* was a challenge by federal employees claiming that their assignments, following the elimination of their prior positions, violated civil service protections. The language the majority quotes is from the court's quotation of a Merit System Protection Board decision on whether transfer *to* a temporary detail constituted a protection-triggering *demotion*. *See* 390 F.3d at 1377 (quoting *Dixon v. United States Postal Serv*., 64 M.S.P.R. 445, 450 (1994)). *Dixon*, the MSPB decision, had reasoned that a "detail by its very nature is temporary." But, assuming it makes sense to extend civil service doctrine to Title VII, there are two fatal difficulties here. First, Pardo-Kronemann's "detail" to the IDB had concluded in November 2000, and he had since been either on leave or in work for the Office of the Secretary that no party here characterizes as a "detail." Second, even if Pardo-Kronemann's activities in the international housing sphere from November 1999 through October 2001 could be classified as a "detail," the quoted passages of civil service doctrine don't address the status of a two-year "detail" into a new field, made explicitly at the employee's request.

In the end, my colleagues offer no colorable answer to the question their approach begs: why would we ask whether a transfer left an employee worse off not vis-à-vis where he was when it happened, but instead vis-à-vis a position he had long since departed at his own request? As far as I am aware, no case in this court or any other, published or unpublished, has ever framed its Title VII "adverse action" analysis as a function of the latter rather than the former inquiry.

10

* * *

Once we select the standard baseline for determining whether an action is adverse, it is clear that there is no genuine issue of material fact whether Pardo-Kronemann can make out a prima facie case of retaliation.

The issue before the court should be whether a jury could reasonably find "*material* adversity," see *Burlington Northern*, 548 U.S. at 68 (emphasis in original), in Pardo-Kronemann's transfer from the position he occupied upon his return to HUD in March 2001, to the position he occupied starting in January 2002. The ultimate inquiry, of course, is whether the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." See *id.* (internal quotation marks omitted).

By his own account (i.e., in the light most favorable to him), Pardo-Kronemann spent the period from March until October 2001 doing three work-related tasks: finishing the handbook; drafting a memo about how HUD could be more effective in the international area; and discussing with another HUD employee a written history of OIA (a task that Pardo-Kronemann had been assigned but which he did not work on because the other employee claimed prior title to the project). See Appellant's Br. at 8-9. During this time, he was technically part of HUD's OGC, but was performing no assignments for that office. See *id*. at 8; Plaintiff's Statement of Facts at 4-5, J.A. 1035-36. While Pardo-Kronemann continued, through at least the early period after his return to HUD in March 2001, "to request [a] second year of . . . detail," this time at the Inter-American Investment Corporation, it was not until October 31, he says, that he requested "legal" work. Appellant's Br. at 8-9. By that time, though, the allegedly retaliatory transfer was, in Pardo-Kronemann's view, well underway; he claims it had been

hatched as early as June of that year, Reply Br. at 24, and in any event no later than September, Appellant's Br. at 11.[3]

Compared with his pre-existing slate of perks and responsibilities, Pardo-Kronemann's job in HUD's Office of International Affairs simply can't be said to be a step down. The new position came with the same grade and pay, Plaintiff's Statement of Facts at 7, J.A. 1038, and left Pardo-Kronemann with the same formal title he had when he left OGC in 1999 and kept when he came back in 2001: Attorney-Advisor, see J.A. 1515. The job description provided, among other things, that he was to "[c]onduct research of laws, legal opinions, policies, regulations, and related legal analyses of foreign governments and international organizations that serve to impede the development of market forces in housing and land development systems." In other words, Pardo-Kronemann was charged with continuing precisely the type of work that he was performing when, he says, the agency

---

[3] Whatever the role (if any) of an employee's expressed aspirations in assessing the "adversity" of an action, Pardo-Kronemann's October 31 expression of interest in garden-variety legal work cannot render his assignment to the Office of International Affairs—which was officially underway no later than October 15—"adverse." See E-mail from George Weidenfeller, Deputy General Counsel, HUD, to Sinthea Kelly et al. (Oct. 15, 2001), J.A. 45 ("[P]lease prepare papers to reassign Jose Pardo Kronemann to the HUD International Affairs Office."). The majority nevertheless sees something significant in the request. Maj. Op. at 15. To be clear, Pardo-Kronemann's claim in this case is that the agency *retaliated* against him. The action he says the agency took by way of retaliation was one the agency had determined to take *before* he revealed his renewed interest in conventional legal work; it escapes me how such an expression could render the prior event retaliatory.

decided to retaliate against him by transferring him to a new department. The handbook regarding mortgage markets in developing nations (the main work of his *old* job) was surely a "comprehensive issue and research paper[ ] . . . . [regarding] legal developments affecting housing and urban policies abroad," part of the work encompassed by the job description for his *new* job. See *id*. If the agency effected any substantive change from the status quo, it was a nominal *expansion* of the array of tasks Pardo-Kronemann was executing during his time back from the Bank; among his newly listed charges was "[p]rovid[ing] advisory services, as requested, on questions of law and interpretation of regulatory and administrative policy in foreign government and multilateral bodies"—a form of work quite distinct from the writing projects he carried out in 2001. See *id*.

Pardo-Kronemann has made a number of arguments why these straightforward conclusions are either wrong or at least too uncertain for summary judgment. None withstands scrutiny.

First is the contention that the transfer could reasonably be deemed adverse because the new job was not a "*bona fide* legal position." Pl.'s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006. The obvious flaw in this disparagement is that it is no more true of the new job than of the old. In the old job, Pardo-Kronemann reported to a policy advisor in the Secretary's office, working on a paper about mortgage markets for eight months. In the new job, he reported to another person, also outside the General Counsel's office, in a position designed for him to do virtually identical work. Regardless of whether that work is characterized as "legal" or

not,[4] the inescapable conclusion is that the new job entailed no diminution of work responsibilities; they were the same, though potentially broader in the new position.

But, says Pardo-Kronemann, this is just an illusion. Even if the new job *description* provided for a suite of duties comparable to the ones he enjoyed before the transfer, the reality of the new position was different: it consisted of low-level research tasks, not on a par with his past handbook-drafting or the new job description. Recording of Oral Argument 6:38-6:53 (Feb. 4, 2010) ("[T]hey manufactured the position description . . . and it had no connection to the reality of his assignments. . . . He was doing low-level research."). The argument fails for two independent reasons. First, Pardo-Kronemann didn't make it in his motion in opposition to summary judgment before the district court. He did offer the bare assertion that "the position description does not accurately describe Pardo-Kronemann's duties," Pl.'s Mem. in Opp. to Mot. for Summ. J. 7, J.A. 1007—but that remark comes in the middle of a three-page discussion of why the new position relegated him to *research* rather than *legal* work. See *id*. at 5-8, J.A. 1005-1008. Not only is the allegation wholly unsupported by reference to any citation to the record, but in context, it can only be read to argue that the portions of the job description that require Pardo-Kronemann to provide "advisory services, as requested, on questions of law," among similar tasks, are inconsistent with the work he was actually assigned. This gets him nowhere. He was not providing "advisory services . . . on questions of law" *before* the transfer

---

[4] In fact, studying the development of primary and secondary mortgage markets appears to be not only very important work, see, e.g., Hernando de Soto, *The Mystery of Capital: Why Capitalism Triumphs in the West and Fails Everywhere Else* (2000), but also "legal" in many senses of the term.

either, at least in the sense of advising line officials as to what conduct was lawful.

Second, the "untrue job description" argument fails because the record contains substantial evidence that the assignments Pardo-Kronemann actually executed were, in fact, undeniably comparable to his work on the handbook—and no material evidence that they weren't. So, for example, his first task in the new position was to "analyze the Puerto Rican housing laws and regulations as a guide to Latin America." Sorzano Dep. at 204 (Nov. 2, 2007), J.A. 1289. Another assignment was to work on the question, apparently fashionable in international policy circles, whether "there is [a] legal right to housing in the sense that the government has to provide [it] to every citizen." Geraghty Dep. at 15 (Nov. 28, 2006), J.A. 1350. Neither the Sorzano testimony nor the Geraghty testimony is susceptible of the interpretation that there was a mismatch between Pardo-Kronemann's job description and job performance such that any change in his work might be thought to represent "*material* adversity." Nor does any other evidence change the calculus.

Pardo-Kronemann also argues that, principal duties aside, ancillary benefits of the new position were significantly different from those of the old. But he offers few illustrative examples, none the least bit telling. One is that in OGC he could travel to conferences to further his legal career, while he couldn't in OIA. But again, whatever force the contention might theoretically have, Pardo-Kronemann himself conceded that, in fact, he didn't travel for his previous work at HUD. See Pardo-Kronemann Dep. at 135 (June 30, 2006), J.A. 1510.

Another imaginable diminution of ancillary benefits might be that while Pardo-Kronemann performed the same work, he did so in a different department. Assuming arguendo that such a change might constitute "*material*

adversity," it simply isn't the case that, in the relevant analysis, Pardo-Kronemann went from doing "non-legal" work as a full-fledged part of the Office of General Counsel to doing such work someplace else. Instead, he went from doing a certain kind of work, reporting to a senior policy advisor in the Office of the Secretary, to doing work of the same kind, reporting to a more senior person in the Office of International Affairs.[5] See Def's Mem. in Supp. of Mot. for Summ. J. 8, J.A. 1466 (making the uncontroverted point that following his transfer, Pardo-Kronemann reported to a higher ranking supervisor than he had before).

A contrary view amounts to the position that it is *always* a jury question whether a lateral transfer is an adverse action. After all, a department switch will always alter future paths to direct (rather than lateral) advancement. And yet even our farthest-reaching cases have refrained from adopting any such per se rule. See, e.g., *Czekalski,* 475 F.3d at 365 ("Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is *generally* a jury question." (emphasis added)); see also *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 n.1 (D.C. Cir. 2008) ("Some courts of appeals have interpreted the adverse action requirement more narrowly than *Czekalski*."). Thus we have multiple times affirmed summary judgments granted for want of an adverse action where an employer had shifted the plaintiff laterally after protected activity. See, e.g., *Jones v. District of Columbia Dep't of Corrections*, 429 F.3d 276, 281 (D.C. Cir. 2005); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999);

---

[5] The transfer, moreover, hardly isolated him from the Office of General Counsel altogether. His first assignment in International Affairs actually originated from OGC. See Affidavit of Jose Pardo-Kronemann at 8 (Sept. 20, 2002), J.A. 1409.

*Johnson v. Williams*, 117 Fed. Appx. 769, 771-72 (D.C. Cir. 2004) (unpublished); *Sussman v. Powell*, 64 Fed. Appx. 248, 249 (D.C. Cir. 2003) (unpublished).

Yet another argument is that Pardo-Kronemann's reassignment to International Affairs was adverse because he had an agreement with HUD to place him in a "mutually agreeable position" upon his return from the Bank, and that HUD breached that agreement by placing him somewhere he didn't want to be. See Letter from Howard B. Glaser, Counselor to the Secretary, HUD, to Jose Pardo-Kronemann, July 21, 1999, at 1, J.A. 1492. Even if such an agreement had existed—notwithstanding the author's proviso, *two sentences* after the "mutually agreeable" language, that "[t]his letter and our discussions are not a settlement or negotiation of any formal complaints you may have, but my attempt to help out an employee who is looking for a more challenging and satisfying work assignment"—it certainly didn't grant to Pardo-Kronemann a perpetual veto over all future employment assignments. To the extent, then, that HUD had committed to allow Pardo-Kronemann to occupy a "mutually agreeable position" upon his return from his detail, the agency discharged that obligation by giving him *eight months* in which to finish the project he'd been working on for the Bank. And, of course, there is literally nothing in the record beyond Pardo-Kronemann's conclusory assertions to suggest that the letter should be construed as an agreement at all. Nor is there any law suggesting that breach of a non-binding agreement with one who engaged in protected activity, standing alone, could ever qualify as adverse action.[6]

---

[6] So far as appears, Pardo-Kronemann makes no claim for breach of contract, a cause of action that, if valid, would on his

Finally, Pardo-Kronemann sees great significance in the fact that his boss at International Affairs, Ms. Sorzano, believed that in his new role, Pardo-Kronemann would not be "fully using [his] skills and legal education." See Appellant's Br. at 54; Pl.'s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006. But this is analytically irrelevant to the "adverse action" inquiry. The question is whether Pardo-Kronemann was made worse off by the transfer *compared with where he was before the transfer*—not whether, after the transfer, he was using his legal skills to the fullest possible extent. As it happens, before the transfer he was doing work that was in a sense legal, and in a sense pure research. After the transfer, the same was true. Nothing Ms. Sorzano said could allow a reasonable jury to conclude otherwise.

> We've previously noted, repeatedly, that
>
> The clear trend of authority . . . is to hold that a purely lateral transfer . . . that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep.

*Brown*, 199 F.3d at 455-56 (citations and internal quotation marks omitted), quoted *in haec verba* in *Jones*, 429 F.3d at 281. There is no plausible, let alone genuine, issue of material fact whether Pardo-Kronemann's transfer was a "demotion in form or substance" compared with the position he occupied upon his return to HUD from the Bank. Cf. *Czekalski*, 475

---

theory give him exactly he what he wants without the bother of proving retaliation.

F.3d at 364-65.  His numerous arguments to the contrary are smoke and mirrors.